STATE *vs.* JAMES BUSCH.

DECEMBER 18, 1937.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

CAPOTOSTO, J. The indictment in this case was brought under general laws 1923, chapter 401, sec. 9 and charges that on, to wit, the 11th day of April 1936, at Woonsocket in the county of Providence, the defendant "unlawfully did keep and exhibit and suffer to be kept and exhibited under his control . . . slot machines and other devices, implements and apparatus to be used in gambling at a game or games of chance for money . . . whereby and by force of the statute . . . the said James Busch, alias John Doe, is taken and held to be a common gambler." The jury returned a verdict of guilty.

The case is before us on two hundred and two exceptions by the defendant, which may be classified as follows. Exceptions 1, 2, 3 and 4 are to the denial of his motion to discharge the jury panel; exception 5 is to a ruling on evidence in the testimony of state trooper Andrew J. Casey; exception 6 is to the admission in evidence of a notebook, (exhibit 1), a bunch of keys, (exhibit 2) and a metal box containing five and ten cent pieces (exhibit 3); exception 7 is to the ruling denying the defendant's motion to strike out the notebook, exhibit 1; exception 8 is to the ruling denying his motion to strike out such portions of the notebook as did not refer to nine certain slot machines which were viewed by the jury; exceptions 9 to 177 inclusive are to rulings as to the testimony of John J. Tierney; exceptions 178 to 200,

omitting exceptions 189, 196, 197, 198 and 199, which are expressly waived, are to various other rulings on evidence; exception 200 is to the denial of defendant's motion for a directed verdict; exception 201 is to a portion of the charge to the jury; and exception 202 is to the denial of defendant's motion for a new trial.

On April 11, 1936, the state police seized nine slot machines, of the quarter, dime and nickel type, in a number of places in Woonsocket. It is unnecessary to describe in detail the operation of these machines, other than to say that, when a player inserts the designated coin in a slot and pulls a lever, the machine is set in motion and, upon stopping, it sometimes pays, in money and in varying sums, more than the player inserted in the slot to set it in motion. That these machines are "devices, implements and apparatus to be used in gambling or playing at a game or games of chance" is obvious and needs no further discussion. The prosecution of the defendant on the indictment before us arose out of the seizure of machines of this character. The term "owners or keepers" will be used by us hereafter to mean the owners or keeper of places in which slot machines were found and seized by the state police, and the word "machine" means slot machine.

It appears from the testimony of the owners or keepers that the machines were openly kept and exhibited by them to be played with and for money by whomsoever was so minded, and that such owners or keepers received or expected to receive forty per cent of the winnings in these machines when they were opened by the person who had the keys thereto. Some of these owners or keepers could not remember who placed the machines on their premises or who paid them their percentage of the money in the machines; some testified that they found their percentage of such money on a counter or in a rear room after the defendant had left their place; and one of these owners positively testified that she permitted the use of the machine in her diner under a direct agreement with the defendant and that

he paid her the forty per cent of the winnings of that machine according to their agreement.

Two state troopers, Andrew J. Casey and Henry Howarth, testified that between April 6 and 11, 1936, acting under orders and while in civilian clothes, they had played eight of the nine machines seized on April 11, 1936, and that generally they lost, although in a few instances the machines paid them back more money than they had deposited in the slot to start them. Both also testified in substance that on April 7 they saw a man, who later proved to be an employee of the defendant, named Clark, fixing the mechanism of a machine in the immediate presence of the defendant and the owner of the place, who were talking together; that they saw Clark take the mechanism out to an automobile bearing Rhode Island registration number 80634, and drive away; and that they followed this automobile in a police scout car until it turned into an alley or lane. An inspector from the state board of public roads testified that, according to the records of that department, automobile registration number 80634 was issued to Emma Busch of 15 Verndale avenue, Providence, which is also the home address of the defendant.

Lieutenant Daniel G. O'Brien testified that on April 11, 1936, he and troopers Casey and Howarth went to one of the places from which three of the nine machines were seized and noticed a group of men playing them; that, entering a back room, he found the defendant and Clark with a metal box from one of the machines, partially filled with nickels and dimes on a bench near them; that he took possession of the box and the money; that when he returned to the main room, he observed trooper Casey taking a bunch of keys out of the back of one of the machines, which keys Casey turned over to him; and that he then arrested the defendant and Clark and brought them to the barracks in Lincoln. Trooper Casey corroborated Lieutenant O'Brien's testimony as to Casey's taking the keys from one of the machines, and further testified that at that time he also found

a notebook bearing the defendant's initials on a table in one of the booths in the main room. The notebook, the bunch of keys, and the metal box with the money were introduced in evidence at the trial as exhibits 1, 2 and 3 above mentioned.

In the afternoon of April 11, 1936, the defendant was questioned at the state police barracks in Lincoln by the attorney general concerning his connection with the machines which had been seized earlier in the day, and also as to the ownership of the notebook that bore his initials. Lieutenant O'Brien and trooper Casey were present at this interview, which was stenographically reported in its entirety by John J. Tierney, a clerk connected with the state police department. The defendant made no general or specific objection to this questioning, nor did he object to the procedure followed by the attorney general during this interview. On the contrary, he answered all questions freely. When he became evasive, the attorney general called in the owners or keepers and had them state, in the presence and hearing of the defendant, what, if any, dealings they had with him.

Two quotations from this questioning as it appears in the testimony of clerk Tierney at the trial are illustrative. Omitting intervening objections that were overruled and exceptions duly noted, the transcript of the testimony before us in one instance reads as follows. Q. "Question to Mr. Busch: 'You don't remember paying Drainville $37 on Thursday?'" A. "No, sir." Q. "Mr. Drainville was interrogated. Question to Mr. Drainville: 'I want you to look at this man. Did you ever see him before?'" A. "Yes." Q. "What is his name?" A. "He told me his name was Jim Busch." Q. "How many times was he in your place this week?" A. "Three times." "Remark by Mr. Busch. 'He might be right. I don't retract any.'" Q. "Question to Mr. Drainville: 'Did he pay you any money this week?'" A. "Yes." Q. "Question to Mr. Busch: 'You paid him money, didn't you?'" A. "Yes." Q. "What did you pay him money for?" A. "For the machine." Q. "A gambling

machine?" A. "Yes." Q. "And you didn't know how much it was you paid him?" A. "No." Q. "How much did he get?" A. "40%." Q. "You put this machine in Drainville's place on the 3rd of April, didn't you? There is a calendar if you want to look at it. That is a week ago yesterday." A. "Well, I don't know what day it was."

Again referring to another such instance, the transcript, with the same omissions already noted, is as follows. Q. "He (meaning the defendant) was there when the money was taken out and he paid you the $3.?" A. "Yes, sir." Q. "When he paid you that money did he tell you what percentage you got?" A. "40%." Q. "And when he paid you the $3. you figured it was 40%?" A. "Yes." Q. "Question to Mr. Busch by Mr. Hartigan. 'Do you want us to bring everybody in Woonsocket in to tie this on you?'" A. "By Mr. Busch: 'O. K., I own them.'" Q. "To Mr. Busch: 'Your machine is in 25 or 30 places?'" A. "No." Q. "What do you say?" A. "Oh, eight or nine."

The sum and substance of this interview at the barracks is that the defendant admitted that he was the owner of the machines and that they were installed in the various places at his solicitation; that Clark was his employee, acting as companion, deliveryman and mechanic; that the machines were operated on the basis of a forty per cent cut to the owners or keepers; that the notebook and bunch of keys found by trooper Casey were his; and that the entries in the notebook, which were in his handwriting, represented "collections" from all his machines, including some that had not been seized.

At the conclusion of the testimony for the state on the substantive offense charged in the indictment, the defendant rested his case without presenting any evidence, either through himself or any other witness, and moved for a direction of verdict in his favor. This motion being denied by the trial justice, the defendant duly noted an exception.

Before proceeding further we wish to observe that counsel for the defendant has at no time claimed that the ques-

tioning of the defendant by the attorney general on April 11, 1936, was unfair and coercive, or that the defendant did not then speak freely and without compulsion. The owners or keepers, who confronted the defendant at that time, appeared at the trial as witnesses for the state, and their testimony in court was substantially the same as their previous statements at the barracks in the presence and hearing of the defendant.

We will now consider the defendant's exceptions in the above order and as above classified. Exceptions 1, 2, 3 and 4 are to the denial of the defendant's motion to discharge the jury panel on the ground that the state had been given, by the clerk of the superior court, certain information respecting the jurors on that particular panel which the defendant did not have. His claim is that such information was furnished by the clerk to the state in violation of public laws 1926, chapter 797, sec. 10, as amended by public laws 1935, chapter 2261, section 1, which provides that the clerk of the superior court shall investigate the names of all jurors and "shall preserve a full record of such investigation, which shall not be disclosed to any person except by an order of the superior court."

In view of the defendant's contention that he was thus being deprived of a fair and impartial trial, the trial justice, with full cooperation from the state, permitted the defendant to show, by testimony and before the jury was sworn, what information the state had received from the clerk of the superior court. This evidence shows that, following the general drawing of jurors for prospective service, the clerk sends out a questionnaire to all such jurors requesting certain information from them with special reference to place and date of birth, residence, occupation, health, claim of exemption from jury service, prior service in the state or federal court within two years, ability to read and write the English language understandingly, and arrest, indictment or conviction. On the return of the questionnaires, the juror's answers are frequently checked by special investi-

gators, and the result of this composite investigation is then entered on a separate card for each juror, which is kept on file by the clerk.

The evidence on this point further shows that, before the present clerk of the superior court went into office and assumed the duties of jury commissioner, his predecessor in the latter office furnished some of this information to the state on small cards with the following headings: "City or Town — Name — Age — Residence — Occupation — Employed by — Education — Place of Birth — Arrest." In doing so, he acted under a standing order, which was made by a justice of the superior court, who was then in charge of the criminal calendar and the drawing of jurors generally, and which was still in force when this case was tried. Following the practice thus established, the present clerk furnished the state with the information called for by the headings that we have just quoted respecting the jurors on the panel for the trial of the instant case. The defendant contends that this information so furnished to the state deprived him of a fair and impartial trial.

We are not concerned in the instant case with the policy of the practice that has been followed by the clerk of the superior court. Whether such practice shall continue, or whether hereafter the superior court shall, in its discretion and upon proper application in a particular case, order the clerk of that court to impartially disclose, in whole or in part, the record of his investigation of jurors, is a matter for the superior court to determine for itself in the first instance. It is conceivable, however, that under the present practice a set of circumstances may arise in a criminal case which may raise so serious a question of prejudice as to nullify an otherwise fair and impartial trial. Our duty now is to determine whether the information disclosed to the state by the clerk was prejudicial to the rights of this defendant. After due consideration we can reach no such conclusion.

Generally speaking, it seems to us that the statute, upon which the defendant so strongly relies, was intended pri-

marily for the protection of jurors, so that they might freely answer the questions propounded to them in the questionnaire without the fear that such answers would be open thereafter to general public inspection. But, in a proper case and upon proper application, the above-mentioned statute permits the superior court, in the exercise of a sound discretion, to order the disclosure of such information, or so much thereof as may be pertinent, by the clerk of that court. There is nothing in the record before us showing that the defendant asked the trial justice for such information. Had he made a motion to this effect and been denied, then a more serious question would be presented. It is worth noting here that the defendant's complaint in the instant case is not directed to the legal qualification, summoning or selection of the jurors, but rather to the fact that the clerk had made a partial disclosure to the state of his preliminary investigation of those jurors. In this connection we further note that most of the information thus disclosed to the state is given on the printed jury list for general use, which counsel for the defendant undoubtedly had and used, namely, the city or town from which the juror is drawn, his name, residence and occupation.

The only other material entry on the state's card which is not on the printed list comes under the heading "Arrest". It cannot, in our judgment, be reasonably contended that the defendant was deprived of a fair and impartial trial because the state may possibly have had information as to some juror having previously come into a substantial conflict with the criminal law. Certainly the defendant had no legal right to have such person sit on the jury in his case. There is no merit in his exceptions 1, 2, 3 and 4, and they are therefore overruled.

Exceptions 5, 6, 7 and 8 have been considered by us and found to be without merit. They are overruled.

The defendant, by exceptions 9 to 177 inclusive, contends that the trial justice erred in permitting John J. Tierney to testify from his stenographic notes of April 11, 1936, re-

specting first, the statements of the owners or keepers who were called and questioned by the attorney general in the presence and hearing of the defendant; and, second, the attorney general's questions to the defendant respecting all the machines mentioned in the notebook and the defendant's answers to such questions. The facts in connection with the interview at the barracks in Lincoln have already been fully stated by us and need not be repeated here.

The ground for the defendant's first contention is that, as the statements of the owners or keepers who were called in by the attorney general were not addressed to the defendant, no inference of his acquiescence in such statements can be drawn from his silence. We cannot follow this reasoning in view of the uncontradicted evidence in this case. The defendant answered all questions addressed to him by the attorney general based upon the answers of owners or keepers, in one instance remarking that "He (the owner or keeper) might be right. I don't retract any", and in another instance admitting that he owned the machines, saying: "O. K., I own them." Whether these and other statements of the defendant were made in answer to the questions by the attorney general addressed to the owners or keepers or to the defendant is immaterial under the above circumstances, as they all formed related parts of one interview. The situation thus created is not one concerning the defendant's acquiescence through silence but of his speaking, without coercion or other improper influences inducing or compelling him to do so. The case of *State* v. *Epstein,* 25 R. I. 131, cited by the defendant, is therefore not in point. Moreover, any question of the competency or admissibility of certain portions of Tierney's testimony was removed when the same owners and keepers appeared as witnesses for the state and testified substantially to the same effect as were their statements on that occasion. In the circumstances such testimony, in any event, becomes merely cumulative and not prejudicial.

The second contention of the defendant under this group of exceptions is that while the attorney general may have rightfully questioned the defendant concerning the nine machines that had been seized by the state police, he had no right to question him, from entries in the notebook, respecting other machines which had not been so seized. This contention also is unsound. The defendant having admitted that the notebook was his, that all entries therein were in his handwriting, and that such entries represented "collections" from machines, the attorney general was clearly justified in attempting to ascertain the extent of the defendant's connection with machines in the city of Woonsocket, as indicated by his own admissions, both orally and in writing. For the reasons stated, exceptions 9 to 177 inclusive, referring to both of the foregoing contentions, are overruled.

The defendant, under exceptions 178 to 195 inclusive, omitting therefrom exception 186, which is waived, claims error in various rulings on evidence during the testimony of owners or keepers, as to what occurred at the barracks on April 11, 1936. We find no merit in these exceptions, and they are overruled.

Exceptions 196, 197, 198 and 199 are waived. The defendant, by exception 200, claims that the trial justice erred in refusing to direct a verdict in his favor. In view of the evidence, this exception is clearly without merit and is therefore overruled.

Under exception 201, the defendant contends that, in charging the jury, the trial justice erred in his explanation of the meaning of the word "control", as used in this indictment. We have carefully examined this part of the charge and find no error. This exception is overruled.

The defendant, under exception 202, claims that the trial justice committed error in denying his motion for a new trial. He strongly urges upon us that the evidence is insufficient to prove the defendant guilty beyond a reasonable doubt, rearguing, with some elaboration, the same contentions that

he advanced under exceptions 200 and 201 just above considered. All we need to say respecting this exception is that we find nothing in the record before us to warrant a new trial, and that in denying this motion the trial justice performed his duty in conformity with both the evidence and the law.

All of the defendant's exceptions are overruled, and the case is remitted to the superior court for further proceedings.

*John P. Hartigan,* Attorney General, *John H. Nolan,* Asst. Atty. Gen., *John E. Mullen,* 3rd Asst. Atty. Gen., for State.

*McKiernan, McElroy & Going, Peter W. McKiernan, John C. Going,* for defendant.