308 A.2d 300.

STATE *vs.* RAYMOND L. S. PATRIARCA.

JULY 20, 1973.

PRESENT: Roberts, C. J., Powers and Kelleher, JJ.

16

18

ROBERTS, C. J. It appears that at about 2:30 on the afternoon of Saturday, April 20, 1968, Rudolph Marfeo and Anthony Melei were shot to death while shopping in a market on Pocasset Avenue in the city of Providence. Apparently, it was Marfeo's custom to shop for groceries in that market on Saturday afternoons, and while he and Melei were in the market two masked gunmen entered and shot them both.

Thereafter, on June 2, 1969, as a result of these homicides three indictments were returned by the grand jury. Indictment No. 69-769 charged the appellant here, Raymond L. S. Patriarca, with conspiring to murder Rudolph Marfeo. Others named in that indictment were Maurice R. Lerner, Robert E. Fairbrothers, John Rossi, and Rudolpho G. Sciarra. In Indictment No. 69-767 the appellant here and Sciarra were charged with being accessories to the murder of Marfeo, while Lerner, Fairbrothers, and Rossi were charged with the murder of Marfeo. In Indictment No. 69-768 the appellant here and Sciarra were charged with being accessories to the murder of Anthony Melei, while Lerner, Fairbrothers, and Rossi were charged with Melei's murder.

The five defendants were tried jointly on all three indictments. With respect to Indictment No. 69-767, the jury found Lerner guilty of murder but returned no verdict against the other four defendants. In Indictment No. 69-768 the jury again found Lerner guilty of murder but returned no verdict against the other defendants. In Indictment No. 69-769 all five defendants were found guilty of

the conspiracy charge. The defendant Patriarca, the appellant here, is now prosecuting a bill of exceptions.[1]

The state relied primarily on the testimony of John J. Kelley of Watertown, Massachusetts, who testified after he had been granted immunity from prosecution. Kelley testified that in the spring of 1968 he was approached by defendant Lerner in Boston, who asked Kelley to come to Providence to plan an escape route from the market where it was intended that Marfeo be shot. Lerner explained that Marfeo was interfering with Patriarca's gambling operation in Providence and Patriarca wanted him killed. A day or two after that conversation Kelley and Lerner traveled from Boston to the Holiday Inn in Seekonk, Massachusetts. There, Kelley testified, he engaged in conversation with Sciarra, Lerner, and two individuals identified during the trial only as Richard Roe and John Doe concerning the proposed shooting of Marfeo. Later that day Kelley visited with Richard Roe and Lerner the market area where the shootings later occurred and then returned to Boston with Lerner.

The following day Kelley drove to the market area once alone and then for a second time accompanied by Roe and Lerner. That evening he returned to Boston with Lerner. He further testified that he went to New York where he purchased face masks. At his home in Watertown he "cut

---

[1] The instant defendant, Raymond L. S. Patriarca, was again tried on Indictments 69-767 and 69-768, each charging him with being an accessory to murder, and after trial on June 4, 1972, the jury returned a verdict of not guilty with respect to each indictment. We consider in this opinion only the exceptions of defendant Patriarca that are pertinent to his appeal from his conviction under Indictment No. 69-769 for conspiracy to murder. This is not to say that our rulings here do not dispose of similar exceptions taken by co-defendants. We have already noted that after nearly three days of deliberation the jury failed to return verdicts against this defendant under Indictments Nos. 69-767 and 69-768, in which he was charged with being an accessory to each of the murders, and consequently the jury was dismissed by the trial justice.

down" a shotgun which he and Lerner later delivered, along with the masks, to Doe in the Holiday Inn in Seekonk.

Kelley further testified that he had returned to a room occupied by Roe at the motel in the company of Lerner on Friday evening, April 5, 1968. There Sciarra, Doe, and Roe participated in a conversation. On the following day, a Saturday, Kelley and Roe left the motel and drove to a cafe about one-half mile from the market. Kelley's car which was to be used in the "get away" was left in the parking lot of the cafe. However, later at the motel Lerner told Kelley that they had gotten to the market too late, just as Marfeo was leaving.

Later Doe suggested to Kelley that a different place be found to leave the stolen car which was to be used in going to and leaving the market. Kelley and Roe then went out looking for a more suitable place to leave the stolen car, concluding that it should be left at the Triggs Golf Course in Providence. On the following evening, April 7, 1968, Kelley, Lerner, Sciarra, Roe, and Doe allegedly met with defendant Patriarca in front of an eating place in Providence known as the Gaslight Restaurant. According to Kelley's testimony, Patriarca, upset over the delay, said: "I don't want to hear any stories, I just want him [Marfeo] killed."

Kelley then testified that on the evening of Friday, April 12, he and Lerner drove from Boston to the motel in Seekonk, where they met Doe and Roe. According to Kelley, the killings were to take place on the following day. However, the event was postponed for reasons not material here. On the following Friday, April 19, Kelley and Lerner returned to the motel, once again meeting with Roe and Doe. Kelley said that he stayed at the motel room with Roe, while Lerner, Fairbrothers, and Rossi spent the night at Doe's house.

The following morning Kelley and Roe left the motel and drove to Providence, where Kelley left his own car at the cafe parking lot and drove with Roe to the golf course. There, Kelley testified, he saw a maroon Buick sedan parked at the far corner of the parking lot. Several hours later he saw Doe drive a vehicle into the parking lot, and three men immediately got out of that vehicle and drove off in the maroon Buick. According to Kelley, these men were Rossi, who got into the driver's seat, Lerner, who got into the rear seat, and Fairbrothers, who sat in the front passenger's seat. Roe then drove Kelley back to the area of the cafe and Kelley got out of the car. Kelley then saw Lerner shooting out of a side street in the "get-away" car. Roe followed Lerner, while Kelley walked to downtown Providence. There he took a taxi to a diner in East Providence where he was later picked up by Roe, who drove back to the motel. In the motel room Lerner indicated that the weapons had been left in the "get-away" car but had been "wiped clean."

Kelley testified further that a few months after the incident he, Rossi, Lerner, and Fairbrothers met together in Methuen, Massachusetts. At that time Lerner allegedly said to Kelley: "He had always thought I [Kelley] was a very good driver, but no one could drive any better than Johnny [Rossi] did, the way he drove up to the store and afterwards." Fairbrothers allegedly responded: "No one could get out of the car any faster than Lerner."

## I. Jury Selection

We turn, first, to defendant's contention that because of prejudicial publicity concerning him, he was deprived of a fair trial by an impartial jury. As we understand it, the thrust of defendant's argument is that publicity concerning his role in organized crime was of such torrential proportions that he is not required to isolate the prejudice that resulted from it. He urges that it was so pervasive in the

community as to make it impossible for any member of the community exposed to it to avoid forming an opinion concerning his guilt that would be irreversible and, therefore, deprived him of a fair trial in a fair tribunal. "A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the *probability* of unfairness." (emphasis added) *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942, 946 (1955).

The defendant refers us to *Estes* v. *Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), as a case involving such extraordinary publicity. There is no question but that the Court in that case concluded that circumstances exist in which a showing of actual prejudice is not a prerequisite to a reversal. The Court said: "It is true that in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused. Nevertheless, at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process." *Id.* at 542-43, 85 S.Ct. at 1632-33, 14 L.Ed.2d at 550.

In *Estes* the Court clearly recognized the occurrence of exceptional or unusual situations wherein pervasive and massive publicity will in all probability result in so prejudicing the defendant as to deprive him of a fair trial. In *Estes* the publicity was so intense and of such a character that the Court concluded that it would implant in the minds of prospective jurors an irreversible opinion as to the defendant's guilt.

The reasoning that led the Court to such a conclusion is made clear in *Irvin* v. *Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The Court talked about a disclosure of a "pattern of deep and bitter prejudice" shown to be present in the community, usually through publicity of

one form or another concerning the defendant's activities. The Court said: "With such an opinion permeating their minds, it would be difficult to say that each could exclude this preconception of guilt from his deliberations. The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man." *Id.* at 727, 81 S.Ct. at 1645, 6 L.Ed.2d at 759.

The cases to which defendant refers us in support of his position all relate to situations marked by unusual, extensive, and prejudicial publicity concerning a defendant. The existence of such exceptional situations was conceded by Justices Clark and Harlan in their dissenting opinion in *Rideau* v. *Louisiana,* 373 U.S. 723, 727, 83 S.Ct. 1417, 1420, 10 L.Ed.2d 663, 666 (1963). They recognized that adverse publicity may "* * * in unusual circumstances, fatally infect a trial when it enters the courtroom indelibly imbedded in the minds of the jurors." *Id.* at 730, 83 S.Ct. at 1421, 10 L.Ed.2d at 667. The question that confronts us, then, is whether the publicity in the instant case was so intense and pervasive as to compel by its nature or character the conclusion that jurors who had been exposed to it would form opinions as to defendant's guilt that would preclude their determining that issue on the evidence developed in the case. We think not. It was not the kind of publicity, despite its massive dissemination, that would have the effect contemplated in *Estes.*

In the first place, the publicity here was not generated and disseminated as a result of defendant's being charged with this crime nor directed to this trial. It had accrued over a period of years as a natural consequence of the notoriety acquired by defendant because of his purported participation in the activities of and leadership in organized crime in New England. Nothing in the record discloses that it was initiated by the prosecution or the news media

just prior to or during the trial in a design to flood the community with rumors of defendant's connection with the crime. Neither was there any dissemination to the public through the press, radio, or television of admissions or confessions made by defendant. It is our opinion that the concurrence of at least some of these factors must be shown to establish the possibility of irreversible prejudice in the minds of the jurors and, therefore, to deprive defendant of due process. *Patriarca* v. *United States,* 402 F.2d 314, 315-18 (1st Cir. 1969). An examination of the federal cases to which we have been referred by defendant's brief persuades us that one or more of such factors are a prerequisite to the establishment of the irreversible prejudice generated by the publicity.[2]

Absent such unusual publicity, the fact that a prospective juror has knowledge concerning a case does not necessarily require his disqualification if the court, on inquiring, is satisfied that he is capable of standing indifferent and of rendering a decision based on the evidence developed at the trial.

In *Irvin* the Court made this view clear. There the Court said: "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best

[2]Some such factors have been specifically identified by the Supreme Court: the broadcasting over television of out-of-court incriminating statements made to the sheriff. *Rideau* v. *Louisiana,* 373 U. S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); publication of testimony given at a recent trial incriminating the defendants, *United States* v. *Dioguardi,* 147 F.Supp. 421 (S.D.N.Y. 1956); intensive publication of testimony given at congressional hearings involving an alleged scandal in which the defendant was involved, *Delaney* v. *United States,* 199 F.2d 107 (1st Cir. 1952); widespread publication of information concerning the defendant that had been excluded from or would be inadmissible in evidence, *Marshall* v. *United States,* 360 U. S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959).

qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin* v. *Dowd, supra* at 722-23, 81 S.Ct. at 1642-43, 6 L.Ed. 2d at 756. See also the dissenting opinion of Justices Clark and Harlan in *Rideau* v. *Louisiana, supra.*

This rule, however, does not relieve the trial court of the necessity for determining whether a juror does, in fact, stand indifferent. The adoption of such a rule "* * * cannot foreclose inquiry as to whether, in a given case, the application of that rule works a deprivation of the prisoner's life or liberty without due process of law." *Lisenba* v. *California,* 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166, 180 (1941). In *Irvin* the Court went on to point out that the burden of proof as to the existence of prejudice is on the challenger and is a question of mixed law and fact. There the Court, quoting from *Reynolds* v. *United States,* 98 U.S. 145, 157, 25 L.Ed. 244, 247 (1878), said: " 'Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside * * *.' " *Irvin* v. *Dowd, supra* at 723, 81 S.Ct. at 1643, 6 L.Ed.2d at 756.

The application of these constitutional principles to the facts leaves the duty of adjudication with the trial justice, and his finding on the intensity of the prospective juror's opinion should not be set aside unless the error is manifest. *Holt* v. *United States,* 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910); *Spies* v. *Illinois,* 123 U.S. 131, 8 S.Ct.

21, 31 L.Ed. 80 (1887); *Hopt* v. *Utah,* 120 U.S. 430, 7 S.Ct. 614, 30 L.Ed. 708 (1887).

The defendant urges that it was error for the trial justice to refuse to inquire whether any of the prospective jurors had read certain specified books. Counsel for defendant asserted that in such books, "Mr. Patriarca is mentioned by name extensively."[3] We cannot agree that the trial justice erred in refusing to conduct such an inquiry. In the first place, defendant did not show that such books constituted a potent source of prejudice to defendant. It is not established that they were anything more than the usual "potboilers" published concerning those whose activities arouse a public curiosity. However, the trial justice, in our opinion, conducted an exhaustive voir dire. The transcript discloses that he inquired of prospective jurors individually the extent to which they had acquired information concerning defendant from what they had read or heard. He also inquired whether this information would prevent them from reaching a verdict based solely upon the evidence developed at the trial, and he was assured that they could reach such a verdict. We are unable to conclude that in these circumstances his refusal to make the specific inquiry requested was error.

The defendant has directed our attention also to the fact that two of the jurors on the panel had disclosed on the voir dire that they had some knowledge of the prior trial and conviction of defendant in Boston on a criminal charge. The record discloses that defendant had challenged each of these jurors for cause on the voir dire, which challenge had been overruled. The defendant, conceding that

---

[3]The books to which the defense referred specifically are "The Godfather," "The Valachi Papers," "Theft of a Nation," and "The Grim Reaper," all of which purport to disclose the activities and the identity of certain organizations and individuals possessed of a powerful status in oganized crime in this country.

his peremptory challenges were not exhausted, failed to use any to dismiss those challenged jurors. He now contends that he was prejudiced by the refusal of the court to disqualify these jurors.

The burden of establishing the partiality of these jurors was on defendant. He has not, in our opinion, met that burden. While we find no error in the refusal to disqualify the challenged jurors, any objection is deemed waived where defendant's peremptory challenges remain unexhausted. In *State* v. *Eaton,* 19 Ohio St.2d 145, 149, 249 N.E.2d 897, 900 (1969), the court said: "A party cannot complain of prejudicial error in the overruling of a challenge for cause if it does not force him to exhaust his peremptory challenges." This rule has had general acceptance by the courts. *United States* v. *Ragland,* 375 F.2d 471 (2d Cir. 1967); *Jordan* v. *Unted States,* 295 F.2d 355 (10th Cir. 1961); *People* v. *Miller,* 71 Cal.2d 459, 455 P.2d 377, 78 Cal.Rptr. 449 (1969); *Manning* v. *State,* 123 Ga.App. 844, 182 S.E.2d 690 (1971); *State* v. *Baldwin,* 276 N.C. 690, 174 S.E.2d 526 (1970); *see also Hopt* v. *Utah, supra; Stroud* v. *United States,* 251 U.S. 380, 40 S.Ct. 176, 64 L.Ed. 317 (1920).

The defendant in this court seeks to justify his failure to use his peremptory challenges to remove these particular jurors from the panel. He contends that the trial justice erred in construing G.L. 1956 (1969 Reenactment) §9-10-18,[4] as providing that the five defendants were jointly entitled to one peremptory for every four jurors called

---

[4]Section 9-10-18 reads as follows: "Peremptory Challenges—Either party in a civil action, or in any criminal proceeding, may, before the opening of such action or proceeding to the jury, challenge in writing, address to the clerk of the court, any qualified jurors called for the trial of said cause or proceeding, not exceeding one (1) in four (4), without alleging or showing any cause therefor; and after such objection the challenged jurors shall not sit in the trial of such cause, but other jurors shall be called to take the place of the challenged jurors for the trial of the cause."

28

for each of the three indictments. He now argues that had he exercised a peremptory challenge after the ruling of the court, he would have waived his exception to that ruling.

We see no merit in this contention. The meaning of §9-10-18 has been established in *State* v. *Sutton,* 10 R. I. 159 (1872), decided by this court more than a hundred years ago. There we said: "However numerous the defendants may be, they are together but one party * * *. It was so in regard to peremptory challenges at common law. The right was not given to each person, but to the parties defendant capitally charged, and if more than one person, they were to join in the challenge." *Id.* at 161. We reaffirmed this view in *State* v. *Ballou,* 20 R. I. 607, 40 A. 861 (1898), and again in *State* v. *Brown,* 45 R. I. 9, 119 A. 324 (1923). We perceive no merit in defendant's contention that the trial justice erred in construing the statute or that, in view of his exception to the ruling thus made, he was obliged to forego exercising his peremptory challenges.

## II. Severance

The defendant contends that the denial by the trial justice of his motions for severance constituted prejudicial error. He does not appear to dispute the basic rule that severance is not a matter of right and that the motion therefor is directed to the discretion of the trial justice. He concedes that the denial of such a motion does not constitute a ground for reversal unless there has been clear abuse of discretion. *State* v. *Kieon,* 89 R. I. 320, 152 A.2d 531 (1959); *State* v. *Ballou, supra* at 608, 40 A. at 862.

Generally, the accepted view in both federal and state courts is that denial of a motion for a severance will not be reversed unless it is affirmatively shown that the defendant did, in fact, suffer prejudice sufficiently substantial to impinge upon his right to a fair trial. *Maupin* v. *United*

*States*, 225 F.2d 680, 682 (10th Cir. 1955). The Supreme Court of the United States has recognized that "* * * the convenience of trying different crimes against the same person, and connected crimes against different defendants, in the same trial is a valid governmental interest." *Spencer* v. *Texas*, 385 U.S. 554, 562, 87 S.Ct. 648, 653, 17 L.Ed.2d 606, 613 (1967). However, this interest may be overridden where it is demonstrated that a fair trial guaranteed by the due process clause of the fourteenth amendment has been denied.

The determination of whether prejudice resulted from the joinder involves the balance of efficiency and convenience in judicial administration on the one hand and the defendant's right to a fair trial without prejudice on the other. The potential for prejudice may be deemed insubstantial when balanced against such considerations as crowded court calendars; the expense of multiple trials; probable reluctance of witnesses to appear at several trials; and that in the future witnesses may become unavailable. However, when these same considerations are balanced against something more than mere abstract prejudice, the prejudice may be substantial and impinge upon the defendant's right to a fair trial. *Gregory* v. *United States*, 369 F.2d 185, 189 (D.C. Cir. 1966).

Generally, contentions that the jury was confused by evidence applicable to each of several co-defendants, by the creation of an unfavorable atmosphere at the trial because of the presence of a particular defendant, that one defendant made statements incriminatory or inadmissible in evidence against a co-defendant, or that the prosecution gained some advantage from the joint trial, do not support a finding that sufficient prejudice existed to reverse a trial justice's denial of his motion to sever. Real prejudice is something more than mere disadvantage, but generally it will be found when the court determines that there is a real

doubt about how the trial irregularity may have affected the jury. *Drew* v. *United States,* 331 F.2d 85 (D.C. Cir. 1964); *Barton* v. *United States,* 263 F.2d 894 (5th Cir. 1959).

In *Drew* the court noted that the argument against joinder is that a defendant may be prejudiced for one or more of the following reasons: "(1) he may become embarrassed or confounded in presenting separate defenses; (2) the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the other crime or crimes charged; or (3) the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find. A less tangible, but perhaps equally persuasive, element of prejudice may reside in a latent feeling of hostility engendered by the charging of several crimes as distinct from only one. Thus, in any given case the court must weigh prejudice to the defendant caused by the joinder against the obviously important considerations of economy and expedition in judicial administration." *Drew* v. *United States, supra* at 88.

Considering the instant case in the light of the criteria set out in *Drew,* we are unable to agree that defendant was so prejudiced by the denial of his motions to sever as to require now a reversal of his conviction. The jury, while convicting this defendant on the conspiracy charge, returned no verdict against him with respect to either of the substantive charges brought against him in the other indictments. The defendant has failed to demonstrate any basis upon which we might conclude that the jury cumulated evidence, inferred a criminal disposition on the part of defendant, or was moved by any latent hostile feelings toward him. It is our opinion, therefore, that the denial of defendant's motions to sever was not fundamentally

prejudicial to his right to a fair trial as guaranteed by the fourteenth amendment of the United States Constitution.

The defendant raises specifically the question of whether the admission of certain hearsay testimony through the witness Kelley violated his rights under *Bruton* v. *United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and thereby justified severance. For the reasons stated in Part VI of this opinion, *infra*, we conclude that *Bruton* has no application in this situation.

### III.   Inspection of Record of Jury Commissioner

During hearings on pretrial motions on January 5, 1970, counsel for defendant requested the court's permission to examine the records of the jury commissioner relating to the investigation made of the prospective jurors by that official. The jury commissioner is required by statute, G.L. 1956 (1969 Reenactment) §9-9-23, to conduct an investigation of all those who are drawn for jury duty. Section 9-9-23 requires that the jury commissioner make such investigations and that he "* * * shall preserve a full record of such investigation, which shall not be disclosed to any person except by order of a justice of the superior court * * *." The court, apparently treating the request as a motion pursuant to the statute for an inspection of the jury commissioner's records, denied it. The defendant now contends that because of the denial of the motion, he was without material information as to the jurors' backgrounds to use in examining them on the voir dire and that the ruling, therefore, constituted prejudicial error.

Counsel for defendant stated that he understood "* * * that the Attorney General has a biographical sketch of each juror as to their education, their occupation, their place of birth. I would ask that the defendants be furnished with that information prior to impaneling." The court, treating it as a motion under §9-9-23, said it would be inclined to deny it. At that point counsel for defendant

stated that he believed "the Attorney General has them on cards." Upon inquiry by the court as to whether the state possessed such records, the prosecutor said: "We've discontinued that practice, in view of the availability of the Jury Commissioner's records to us or the defendants on motion." While the response was ambiguous, it was apparently accepted by the court and defense counsel as stating that he had no such records in his possession.

Thereupon, counsel for defendant requested that he be allowed to examine such records. The court replied: "You know, that is in here someplace. I don't think I'll take the time to look it up. It's there, but that is done in advance of trial. You can't move at this last minute for me to have the Jury Commissioner open his records." He then denied the motion. Again counsel for defendant asked the court to authorize him to inspect such records if the jury commissioner had no objection. To this the court responded: "It isn't whether he has an objection or not. We have a statute that I'm not going to look up."

Section 9-9-23 was construed, in pertinent part, by this court in *State* v. *Busch,* 59 R.I. 382, 388-90, 195 A. 487, 490-91 (1937). It appears that in 1937 it had become an established practice of the clerk of the Superior Court to furnish the state with information concerning the investigations made of potential jurors pursuant to a standing order of a justice of the Superior Court. In *Busch* the defendant argued that the information so furnished to the state deprived him of a fair and impartial trial. The court noted that it was conceivable that under that practice, circumstances might arise in a criminal case which would raise a serious question of whether the defendant was so prejudiced as to be deprived of an otherwise fair and impartial trial.

As we then said, the statute was intended to operate to preclude indiscriminate examinations of the records of the

jury commissioner. However, it is obvious that the statute was further intended to provide an equal opportunity for the parties to a trial to have available essential information concerning the jurors who comprise the panel. As we said in *Busch*, the motion is, of course, addressed to the sound discretion of the trial court. The court went on to say: "But, in a proper case and upon proper application, the above-mentioned statute permits the superior court, in the exercise of a sound discretion, to order the disclosure of such information, or so much thereof as may be pertinent, by the clerk of that court." *Id.* at 390, 195 A. at 491. This court, however, noted that the record did not disclose that any motion had been made by the defendant for such an examination and indicated that had such a motion been made, a serious question could have been presented for its consideration. However, on the basis of the absence of such a motion, the court held that the defendant in *Busch* had not been prejudiced.

The instant case, however, differs from *Busch* for in that case the state had the information, while the defendant did not. Here it was not established to the trial court's satisfaction that the state had such records in its possession, and, therefore, the question of the prosecution having an unfair advantage is not present. The question here is simply whether the denial constituted an abuse of discretion on the part of the trial justice and substantially prejudiced defendant.

The primary purpose for the enactment of this statute was to make the voir dire a more meaningful procedure by providing available information relating to the members of the panel to counsel for both the prosecution and the defense. It is true that in this state counsel are furnished with a printed list of the potential jurors drawn for the jury during each jury period. This list informs counsel of the name, address, and occupation of each po-

34

tential juror. However, a more comprehensive report as to the identity and background of the potential jurors is contained in the records of the jury commissioner's investigations, and the availability to counsel of such information assures a more adequate examination of potential jurors on the voir dire.

The legislative intent, as we have said, is to make this information available to counsel subject to the approval of a request therefor by a justice of the Superior Court. The power granted such a justice is clearly negative, that is, designed to authorize a denial of the request where such inspection would have an adverse effect upon the duties of the jury commissioner or would impinge upon the effective administration of justice. We are persuaded that such a request should be denied only for compelling reasons.

The trial justice here apparently based his denial on his view that it was a "last minute" attempt to have the jury commissioner open his records. The record discloses that the motion was made on January 5, 1970, and that the voir dire did not begin until February 17, 1970. We cannot agree that in such circumstances the request was untimely. We feel that its denial constituted error on the part of the trial justice. However, in our opinion, defendant was not prejudiced by this denial. The record indicates that he possessed the regular jury list indicating the name, address, and occupation of each potential juror. Apparently, this is the same information the state had, and nothing in the record suggests that the state had an unfair advantage. In such circumstances, we find nothing to demonstrate that the refusal of the trial justice to order the jury commissioner to release the requested information affected the jury's verdicts. As such, we conclude that the trial justice's denial was harmless error.

## IV.  Association of Defendants Prior to the
## Beginning of the Conspiracy

In the course of the trial two police officers testified that they had observed defendants in the company of one another on several occasions prior to the date set out in the indictment as the time of the beginning of the conspiracy, March 1, 1968.  Philip Paquin, a member of the Attleboro Police Department, testified that in August of 1967 he had observed defendants Sciarra and Lerner, together with a third man, sitting in a parked motor vehicle at the Holiday Inn in South Attleboro.  Donald F. Kennedy, a member of the Providence Police Department, testified that during the course of his regular patrols in the Federal Hill section of Providence, he frequently observed the various defendants in the company of one another.  Kennedy's testimony related to observations made during a period of about six months preceding the slaying on April 20, 1968.

The defendant now argues that the admission of this testimony was prejudicial error on the theory that evidence of the acts of co-conspirators is admissible only when engaged in during the term of the conspiracy.  Conceding that this testimony related to a period prior to March 1, 1968, we cannot agree that it was inadmissible.

In *United States* v. *Armone,* 363 F.2d 385, 403-04 (2d Cir. 1966), the Second Circuit held that since agreement is an element of conspiracy, evidence of association between alleged co-conspirators is relevant.  In that case the court held that the admission into evidence of a nightclub photograph showing some of the defendants sitting together and a telephone number book containing the names of several defendants was proper as providing evidence from which the jury could infer that the defendants knew one another and had the opportunity to reach an agreement with regard to the object of the conspiracy. *See*

*also Williamson* v. *United States,* 310 F.2d 192, 199 (9th Cir. 1962).

The trial justice placed this evidence in the proper context when he instructed the jury that "[m]ere suspicion, speculation or associating together of those accused does not establish a conspiracy * * * [However,] common design or conspiracy may be deduced from circumstances, where they exclude every reasonable hypothesis but that of defendants' guilt of conspiracy. In other words, the proof must not only be consistent with guilt, but at the same time it must be inconsistent with a reasonable hypothesis of innocence." Through this instruction the trial justice apprised the jury of the fact that mere association did not constitute conspiracy but was a circumstance which the jury might consider in determining the existence of an agreement to commit a crime. Therefore, defendant's exception is overruled.

### V.  Denial of the Motion to Pass

This defendant joined with the other defendants in moving that the case be passed prior to the swearing of the jury and again prior to the presentation of the state's case.  They urged that because of the unavailability of an alleged material witness, Alfredo Rossi, father of defendant Rossi, the motion to pass should have been granted.  On both occasions the court denied the motion without prejudice to its being renewed by any of the defendants during the course of trial.  However, it does not appear from the record that the motion to pass was renewed either by this defendant or by the others during the month in which testimony was taken.

No offer of proof was made, but generally it appears that Rossi's father might have testified as to the whereabouts of Rossi during the afternoon of April 20, the time of the slayings.  Such evidence, if believed, might have established an alibi for Rossi relating to the time of the

slayings, but we are unable to agree that Patriarca would have been prejudiced by the denial of the motion even if it constituted error. However, Patriarca, along with the other defendants, argues that, being accused of having conspired with the others primarily on the basis of the testimony given by Kelley at trial, any testimony which might tend to impeach the credibility of Kelley would weaken the probative force of his testimony against the remaining defendants.

At the trial the defense offered testimony through Michael Accetta, a friend of the Rossi family, who testified that on the day of the slayings he saw John Rossi at his home sometime between 1:30 and 2 o'clock in the afternoon. The defendant Rossi's mother then testified that her son had spent the evening preceding the slayings at home, that she awakened her son about 11 a.m., and that he left the house between 1:30 and 2 o'clock just as Accetta arrived. Kelley had testified that Lerner, Fairbrothers, and Rossi had slept at Doe's house on the night before the slayings. As we noted, defendant contends that the testimony of Rossi's father would not only have established an alibi for Rossi at the time of the slayings but would have tended to impeach Kelley's testimony concerning his participation in the conspiracy.

It is well established that a motion of this nature is directed to the sound discretion of the trial justice. *Strzebinska* v. *Jary*, 58 R.I. 496, 193 A. 747 (1937). However, that discretion must be exercised in a manner consistent with the constitutional guarantees involved. *State* v. *Rossi*, 71 R.I. 284, 43 A.2d 323 (1945). In that case we recognized that a limitation upon the sixth amendment's guarantee "to have compulsory process for obtaining witnesses in [defendant's] favor" may arise where the trial justice denies a motion to pass or continue trial due to the unavailability of a defense witness. Due process requires

that every defendant have a full opportunity to establish the best and fullest defense available to him.

In order to establish that the denial constituted an abuse of discretion, it is the obligation of the appellant to show, first, that the testimony of the absent witness would be material; second, that he had used due diligence to procure the attendance of the witness or his deposition; third, that it is reasonably certain that the presence or testimony can be procured at the time to which the trial would be postponed; and, fourth, that such testimony be not merely cumulative. *Jackson* v. *State,* 214 Md. 454, 459, 135 A.2d 638, 640 (1957); *State* v. *Wilcox,* 21 S.D. 532, 114 N.W. 687 (1908); *Lacks* v. *Commonwealth,* 182 Va. 318, 324, 28 S.E.2d 713, 715 (1944). In *Wilcox, supra* at 536-37, 114 N.W. at 689, the South Dakota court indicated that if a motion for a continuance or to pass a case fails to establish any one of these conditions, the motion is properly denied.

We are of the opinion that no testimony was offered to indicate that Alfredo Rossi's testimony would in any manner differ from that of Accetta or defendant Rossi's mother. Nor did defendant make any offer of proof to indicate that the elder Rossi's testimony would be material or that he had used due diligence to procure the attendance of the elder Rossi during the trial. We have held that where a defendant seeks on appeal to establish the materiality of any evidence, we will consider it only where an offer of proof has been made during the trial. *State* v. *Jefferds,* 91 R.I. 214, 217, 162 A.2d 536, 538 (1960). No such offer of proof was made in this case. It is our opinion, then, that the denial of the motion to pass the case was not error.

The defendant has not directed our attention to an attempt on his part or on the part of any of the other defendants to renew the motion to pass the case at any time

during the presentation of the state's case and the defense. We have held that where trial counsel desires an exercise of a trial court's judicial discretion, it is incumbent upon him to invoke such action through the medium of an appropriate motion wherein the purpose thereof is clearly and expressly stated. The record does not disclose any such action in the instant case. Consequently, there was no ruling by the court that would now be subject to a valid exception requiring us to review the question of whether the court abused its discretion. *State* v. *Ouimette*, 110 R.I. 747, 766, 298 A.2d 124, 136 (1972). This exception is without merit.

### VI.   Right of Confrontation

The defendant again directs our attention to a conversation alleged to have taken place in Methuen, Massachusetts, some months after the date of the slayings. It appears that Kelley, Lerner, Fairbrothers, and Rossi were the participants, while Patriarca and Sciarra were not present. As we have already noted, this conversation was, in a very limited way, a rehash of the events that occurred on the day of the slayings. Kelley testified that Lerner said no one could drive better than Rossi did "the way he drove up to the store and afterwards." He testified also that Fairbrothers had said: "No one could get out of the car any faster than Lerner."

The defendant now contends that these statements, having been made after the termination of the conspiracy, were admissible in evidence, if at all, only against the declarants and certainly were not admissible against him. Generally, under the exception to the hearsay rule, declarations of co-conspirators made after the termination of the conspiracy may be received only against the declarant, and where such evidence is admitted, co-conspirators are entitled to an instruction that such statement may be considered only against the conspirator who made it. 3 Under-

40

hill, *Criminal Evidence* §864 at 178 (5th ed. 1970 Supp.); *see also United States* v. *Miller,* 340 F.2d 421, 423 (4th Cir. 1965); *People* v. *Chavez,* 50 Cal.2d 778, 790, 329 P.2d 907, 914-15 (1958); *Malcolm* v. *State,* 232 Md. 222, 225, 192 A.2d 281, 283 (1962). In the federal courts "* * * it is firmly established that where made in furtherance of the objectives of a going conspiracy, such statements are admissible as exceptions to the hearsay rule. This pre-requisite to admissibility, that hearsay statements by some conspirators to be admissible against others must be made in furtherance of the conspiracy charged, has been scrupu-lously observed by federal courts." *Krulewitch* v. *United States,* 336 U.S. 440, 443-44, 69 S.Ct. 716, 718, 93 L.Ed. 790, 794 (1949).

In some jurisdictions, however, declarations of a con-spirator are admissible against a co-conspirator when they are made during the pendency of the conspiracy, and this includes not only the period prior to the perpetration of the offense but also the period of its subsequent conceal-ment. This is on the theory that there is an implied agree-ment among the conspirators to act together to conceal their participation in the criminal act. 2 Wharton, *Crimi-nal Evidence* §430 at 204-05 (12th ed. 1955); *see also Dutton* v. *Evans,* 400 U.S. 74, 81, 91 S.Ct. 210, 215-16, 27 L.Ed.2d 213, 222 (1970).

We are not aware that this court has expressly adopted either view. In our opinion, however, the rationale under-lying the federal rule is sound and persuades us to hold that declarations of a co-conspirator made after the termi-nation of the conspiracy are admissible only against the declarant. We, like the federal courts, tend to look with disfavor on attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecution. *Grunewald* v. *United States,* 353 U.S. 391, 404, 77 S.Ct. 963, 974, 1 L.Ed.2d 931, 943 (1957). For this reason we agree with

defendant's contention that, as to him, the testimony of Kelley was inadmissible.

The defendant suggests alternatively that the jury should have been given a cautionary instruction that the evidence so adduced is not applicable to him. In fact, though, he is contending that under *Bruton* v. *United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), any cautionary instruction given would have been inadequate to cause the jury to follow that instruction and apply such evidence only to the declarants. This, he contends, effectively deprived him of his rights of cross-examination with respect to the declarants, Lerner and Rossi.

The defendant Bruton had been charged with participating with a co-defendant, Evans, in a postal robbery. At a joint trial of both defendants, a postal inspector testified that Evans had confessed to him prior to the trial and had involved Bruton in the commission thereof. It cannot be doubted that the confession was inadmissible as against Bruton. The trial justice, however, admitted such testimony against the declarant, instructing the jury that the confession was inadmissible as to Bruton and that it should be disregarded in passing upon the question of Bruton's guilt. The Supreme Court reversed the conviction, concluding that it could not be said with any certainty that the jury would disregard such a positive piece of evidence as the testimony concerning the co-defendant's confession.

In *Bruton* the Court overruled *Delli Paoli* v. *United States,* 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957). In that case the Court had held that it would presume that a jury would follow the limiting instructions of the court and, therefore, avoid an encroachment upon the right of confrontation by an appropriate instruction to the jury to disregard the inadmissible hearsay evidence. In

*Bruton,* however, the Court considered the substantial risk, in the circumstances of that case, that a jury, despite instructions to the contrary, would look to the incriminating extrajudicial statements in determining a co-defendant's guilt and held, therefore, that the admission of the Evans confession to the postal inspector at the joint trial violated the petitioner's right to cross-examination secured by the confrontation clause.

The question to be resolved is whether the rule in *Bruton* is applicable in the instant case. The Supreme Court in *Dutton* casts considerable light on the real thrust of the opinion in *Bruton.* In that case, involving the admission into evidence of statements by an alleged co-conspirator, the Court said: "This case does not involve evidence in any sense 'crucial' or 'devastating,' as did all the cases just discussed. It does not involve the use, or misuse, of a confession made in the coercive atmosphere of official interrogation, as did *Douglas, Brookhart, Bruton,* and *Roberts.* It does not involve any suggestion of prosecutorial misconduct or even negligence, as did *Pointer, Douglas,* and *Barber.* It does not involve the use by the prosecution of a paper transcript, as did *Pointer, Brook-hart,* and *Barber.* * * * And it certainly does not involve the wholesale denial of cross-examination, as did *Brookhart.*" *Dutton* v. *Evans, supra* at 87, 91 S.Ct. at 219, 27 L.Ed.2d at 226.

In our opinion, then, the Court in *Dutton* explained the limitations on the application of the rule in *Bruton* to cases in which the fact situations are such that it would be unreasonable to expect that the jury would follow the limiting instructions of the trial court. In short, *Bruton* is applicable only where it appears that there exists a substantial risk of prejudice to the defendant because the evidence in question consists of direct potent incriminatory extrajudicial statements made by the co-defendant put

before the jury in a joint trial, so that it is clear that the jury could not reasonably be expected to follow limiting instructions.

The circumstances of the instant case do not require an application of the rule in *Bruton*. The hearsay here was not the devastating, crucial, incriminatory statement considered in *Bruton*. In the first place, the testimony of Kelley regarding the conversations at Methuen, Massachusetts, implicated neither Patriarca nor Sciarra, nor were the statements made in the atmosphere of coercion that surrounds custodial interrogation. These statements did nothing more than suggest that those persons present at the meeting in Methuen had participated in the slayings, a fact which had been fully established by prior testimony of the witness Kelley. In short, the testimony here cannot be said to have given rise to the substantial risk of prejudice to either Patriarca or Sciarra.

Secondly, the hearsay admitted here is not so lacking in reliability as to make manifest a violation of the confrontation clause. The need for cross-examination under the confrontation clause becomes critical where it is necessary to determine the reliability of the truth-determining process in criminal trials. *California* v. *Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). Obviously, the reliability of such hearsay being important, the unreliability thereof is intolerably compounded when the alleged accomplice does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the confrontation clause was directed. *Bruton* v. *United States, supra* at 136, 88 S.Ct. at 1628, 20 L.Ed.2d at 485.

Obviously, the statements were not made for the purpose of incriminating others, particularly defendants Patriarca and Sciarra. There was no reason for either Lerner or Fairbrothers to lie under those conditions. Kelley, testify-

44

ing as to what occurred at Triggs Golf Course on the day of the slaying, placed Rossi behind the wheel of the car used, with Fairbrothers beside him on the front seat and Lerner in the rear seat. Kelley had been extensively cross-examined about this testimony. In our opinion, such indicia of reliability are generally regarded as the basis for a constitutionally valid hearsay exception and are determinative of whether a statement made may be placed before the jury, even though there is no opportunity for cross-examination of the declarant. *Dutton v. Evans, supra* at 89, 91 S.Ct. at 220, 27 L.Ed.2d at 227. In the circumstances, we conclude that these exceptions are without merit.

We note parenthetically that the record does not disclose that the trial justice gave any cautionary instruction to the jurors limiting the applicability to the declarants of the statement to which Kelley testified. The defendant, while objecting to their admission and moving for severance on the basis thereof, did not request any such cautionary instruction. Further, we note that the court in its charge instructed the jury that declarations made by a co-conspirator during the course of the conspiracy are admissible against all co-conspirators. However, he specifically instructed them that the conspiracy terminated on April 20, 1968, the day of the slayings. Consequently, it appears that the jury was instructed on the basis of the federal rule and should not, in passing on the guilt of any of the defendants, consider any act or statement of a co-conspirator made after April 20, 1968. The trial justice's instruction to the jury on the law of conspiracy precluded consideration of these statements against Patriarca. We must assume the jury followed those instructions in view of our conclusion that *Bruton* has no application in this case.

VII.   Rebuttal Testimony of Reverend Joseph Invernizzi

The Reverend Joseph Invernizzi testified for the defense concerning a visit he made to the home of Fairbrothers. His testimony was apparently an attempt to establish an alibi for Fairbrothers on the day of the slaying. This witness testified that he had been in the Fairbrothers home, somewhere between 1:30 and 2 o'clock in the afternoon, and remained for 20 to 30 minutes. He did not testify, nor was he asked, either on direct examination or on cross by the prosecutor, what day of the week it was that he made this visit. However, on direct examination the priest had testified that on Saturday afternoons confessions were heard in his parish from 3 to 6 and 7 to 9 and that there was a schedule which assigned each priest to an hour. The cross-examination was concluded, and no redirect examination was desired.

After a midmorning recess the prosecution requested leave to ask a few more questions of the witness on cross-examination. The court made no decision on this request until after the noon recess. At that time, noting that the prosecutor had interviewed the priest during the noon recess, the court refused to allow any further cross-examination but did say that the state could call him as a rebuttal witness if it so desired. After objections to this procedure were made known to the court, rebuttal evidence was adduced by the prosecutor to the effect that the priest could not testify that it was on Saturday that he went to the Fairbrothers home and that he could not say what day of the week it was. Thereafter, a motion was made by the defense to strike the rebuttal testimony, which motion was granted.

The defendant now contends that the testimony offered in rebuttal was so prejudicial to defendant that it constituted reversible error. Obviously, any error arising out of the admission of the rebuttal testimony, so called, is

not before us, the motion to strike having been granted. However, defendant, as we understand him, is arguing that this testimony referring to the inability of the priest to state the day of the visit to Fairbrothers' home was so prejudicial that it constituted reversible error. The defendant's argument rests, again, on the theory that a mere instruction to the jury that the evidence was being stricken and that they were to disregard it was insufficient to warrant an assumption that the jury would follow such an instruction.

We were confronted with a contention of similar import in *State v. Ouimette,* 110 R.I. 747, 773, 298 A.2d 124, 139 (1972). There we held, relying on *Bruton, supra,* that it is not unreasonable to conclude that in many cases involving the mere admission of improper evidence the jury can and will follow the instruction of the court to disregard such evidence. Relying upon *Bruton v. United States, supra,* and the cases cited therein, we pointed out: " 'Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. * * * It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information.' " The defendant here, as in *Ouimette,* has failed to establish the peculiar risk of prejudice which we have held is necessary to constitute reversible error. Therefore, this exception is overruled.

## VIII. Rebuttal Testimony of Thomas Marfeo

The defendant alleges that the trial justice committed prejudicial error in permitting the rebuttal testimony of Thomas Marfeo, brother of the victim, Rudolph Marfeo. Marfeo testified that on several occasions prior to the

murder, his brother had related to him that he believed that a great deal of ill will existed between himself and Patriarca and that he believed his life to be "in jeopardy because of Raymond Patriarca." The state contends that this testimony was offered to show the state of mind of the victim in rebuttal to the testimony of another brother of the victim, Frank Marfeo, who had testified that the relationship between his brother, Rudolph, and Patriarca was very cordial and friendly.

What has been described by the prosecution as the state-of-mind exception to the hearsay rule has a very narrow and limited application. The state of mind or intent of a person, whenever material, may be reflected in his out-of-court statements. Many very fine distinctions have been made with regard to the admission of statements designed to prove the state of mind of the declarant.[5]

The victim's declarations regarding fear or threats related in court by a third person fall within the state-of-mind exception, but have been regarded with a wary eye by many courts. The first approach, which has been adopted in Massachusetts, precludes the introduction of evidence of a murder victim's declarations asserting the defendant's threats or other hostile conduct toward the

---

[5]In *State* v. *Vaccaro*, 111 R.I. 59, 62, 298 A.2d 788, 790 (1973), we indicated that when evidence is not introduced to prove the truth of a statement, it does not actually fall within the hearsay rule. Two distinct types of statements may be used to demonstrate the state of mind of the declarant. The first is simply a statement as to his feeling or his state of mind. In other cases the declarations are not assertive of the declarant's present state of mind but rather simply provide evidence from which that state of mind may be inferred. In a treatise on evidence, Professor McCormick has indicated that "[c]ourts, however, have tended to lump together declarations asserting the declarant's state of mind with those tending to prove the state of mind circumstantially and have developed a general exception to the hearsay rule for them without regard to the possibility that many could be treated simply as nonhearsay." McCormick, *Evidence* §294 at 694 (2d ed. 1972).

declarant unless the conduct or statements were made by the accused in the presence of the witness. Testimony concerning threats preceding a crime can properly come only from one who heard them or witnessed them. *Commonwealth* v. *DelValle,* 351 Mass. 489, 495, 221 N.E.2d 922, 926 (1966).

A second approach, which has been adopted in California and which we adopt here, would permit the use of such testimony to demonstrate the state of mind of the victim where the question of fear is in issue. However, even the California rule is restrictive. It requires not only that the state of mind of the declarant be in issue but also that such testimony refer only to threats concerning future conduct on the part of the accused, that such declarations be shown to have been made under circumstances indicating that they are reasonably trustworthy, and that they show primarily the state of mind of the accused at the time the declaration was made. *People* v. *Hamilton,* 55 Cal.2d 881, 362 P.2d 473, 13 Cal.Rptr. 649 (1961); *People* v. *Schindler,* 273 Cal.App.2d 624, 637-40, 78 Cal.Rptr. 633, 641-42 (Ct. of App. 1969); *People* v. *Finch,* 213 Cal.App. 2d 752, 763-70, 29 Cal.Rptr. 420, 427-30 (Ct. of App. 1963).[6]

The state of mind of the victim Marfeo was placed in issue inasmuch as the defense offered evidence to show a cordial, friendly relationship between Marfeo and Patriarca. The state offered the testimony now criticized simply to rebut that defense contention. Statements as related by the witness apparently do refer to threats as to future conduct on the part of the accused and do reflect the state of mind of the victim at the time the statements were made. The precise circumstances under which the statements were made which would tend to indicate whether

---

[6]These cases represent a recognized exception to the rule stated in Cal. Evid. Code §1250 (West 1968).

or not they were reasonably trustworthy were not outlined in the testimony. However, defendant made no effort to ascertain whether the circumstances in which these statements were made tended to suggest the unreliability thereof. That being so, we find no error in the admission of this testimony as rebuttal evidence.

## IX.   Coercion in Charging the Jury

The defendant alleges that various remarks to the jury by the trial justice were coercive and prompted compromise and inconsistent verdicts. The record does disclose that the trial justice indicated his desire to complete the trial in time to have the jury home for the Easter holiday. The defendant has translated such references into coercion. We find no justification for the conclusion that the guilty verdicts which are before us here were coerced by the trial justice's remarks. The jury deliberated for nearly three full days before returning its verdicts. The defendant fails to substantiate by his brief in any meaningful way that the verdicts are inconsistent. He does make reference to the fact that Kelley's testimony placed defendants, Fairbrothers and Rossi, in one of the vehicles used as transportation to and from the scene of the crime. He suggests that if the jury believed this testimony, it had no choice but to find these defendants guilty of both conspiracy and murder. However, it would seem that if, as defendant alleges, there is little to link Fairbrothers and Rossi to the alleged crimes, except Kelley's testimony as to their presence in the vehicle, it is quite conceivable that the jury could have believed that the pair was involved in the conspiracy and at the same time believe that their guilt on the murder charge was not established beyond a reasonable doubt.

The defendant further contends that the dismissal by the trial justice of the jury before it reached verdicts on

50

all charges was improper. He alleges that the dismissal was another indication of the trial justice's desire to end the trial quickly and that he failed to take precautions necessary to assure himself that the jury was hopelessly deadlocked. We need not consider whether the trial justice abused his discretion in dismissing the jury, despite the fact that it appears from the record that he had ample justification to believe that the jury was stalemated.[7]

The defendant is unable to demonstrate any prejudice, since the dismissal of the jury in no way invalidates the guilty verdict which they returned, and defendant was subsequently retried and acquitted of all of the offenses upon which this jury failed to reach verdicts. The authorities to which defendant directs our attention all represent instances where a defendant challenges the validity of a retrial on charges upon which a previous jury had been dismissed before a verdict was reached. Because defendant's claim that the trial justice had acted improperly in dismissing the jury might bar retrial if an abuse of discretion could be established, such a claim in no way constitutes an impediment to the guilty verdict which was reached through full and fair deliberation prior to the dismissal. See United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971) (retrial precluded on double jeopardy grounds); State v. Nelson, 19 R.I. 467, 34 A. 990 (1896).

---

[7] At 5:40 p.m. on Friday, March 27, 1970, the third day of deliberation, the trial justice summoned the jury to the courtroom. At that time the jury indicated that it had reached verdicts "in some of the cases as to some of the defendants" but that it "could not come to an agreement on any of the other cases." The trial justice then gave the disputed charge and asked that the jury continue deliberation. The record indicates that later in the evening the trial justice inquired of the jury: "Have they agreed on any further verdicts *since they returned* or are they deadlocked?" The foreman answered: "We've not agreed upon *any further verdicts*. We're deadlocked." (emphasis added) At that point the trial justice dismissed the jury.

## X. Psychological Coercion of the Jury

The defendant contends that he has been deprived of a fair and impartial trial by jury guaranteed by the sixth and fourteenth amendments, inasmuch as various remarks made by the trial justice to the jury constituted prejudicial error. He first contends that it was error for the trial justice to call the jury to the courtroom after it had deliberated for nearly three days to give them the *Boswell* charge, so called. At that time the trial justice reminded the jury that it should attempt to reach a unanimous verdict without compromising any firm conviction as to guilt or innocence simply to join the others.

The defendant objects specifically to his language suggesting: "[J]uries almost always reach unanimity in fairly and open mindedly passing on the evidence. It must be obvious to you that the jury system just would not work otherwise * * * another jury at a future date will have to sit through another trial of these cases. I am sure no other jury to be selected in the future would be any better qualified to hear and decide the cases than you are. They have been exhaustively tried over a period of several weeks. Another trial would entail additional heavy expense upon both the state and the defendants." This is essentially the same language which in *State* v. *Boswell*, 73 R.I. 358, 366, 56 A.2d 196, 200 (1947), we held was the means by which the trial justice "* * * asked the jury to continue consideration of the case and advised them to try for an agreement through the process of fair discussion and dispassionate reasoning." The defendant compares this language to that of the *Allen* charge, so called, which was upheld by the United States Supreme Court in *Allen* v. *United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), but which has been criticized of late. *See, e. g., Thaggard* v. *United States*, 354 F.2d 735, 739 (5th Cir. 1965) (concurring opinion); *State* v. *Thomas*,

86 Ariz. 161, 342 P.2d 197 (1959); *State* v. *Randall*, 137 Mont. 534, 353 P.2d 1054 (1960); *A.B.A. Project on Minimum Standards for Criminal Justice, Trial by Jury*, §5.4 (b) and Comment (approved draft 1968). He suggests that the language used by the trial justice in this case was more prejudicial than that of *Allen* and its progeny.[8]

The most frequent criticism of the *Allen* charge is directed toward the fact that a juror who holds a minority position is directed to question his own thinking simply because several of his fellow jurors have reached a contrary conclusion. It has been contended that such a direction adds unjustified weight to the majority view on a divided jury without suggesting that those in the majority should also re-evaluate the strength of the minority view. *United States* v. *Fioravanti*, 412 F.2d 407, 417 (3d Cir. 1969). In the instant case the trial justice made no reference whatever to the minority but simply encouraged all jurors to make an effort to reach unanimity. In doing so, he exercised an abundance of caution in advising the jurors not to abandon conscientiously held views simply to accommodate others. For this reason we are unable to conclude that the trial justice abused his discretion in recalling the jury as he did.

---

[8]The particular language of the *Allen* charge to which most criticism has been directed is substantially as follows: "* * * although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority." *Allen* v. *United States*, 164 U. S. 492, 501, 17 S.Ct. 154, 157, 41 L.Ed. 528, 530-31 (1896).

It is our opinion that this case demonstrates the need for a solution to forestall continued litigation over the validity of the *Allen* charge. Such a solution, in our opinion, is to be found in the *A.B.A. Project on Minimum Standards for Criminal Justice, Trial by Jury,* §5.4 (a) and (b) (approved draft 1968). That section provides that before deliberation the court may instruct the jury: (1) that in order to return a verdict, each juror must agree thereto; (2) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment; (3) that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors; (4) that in the course of deliberations, a juror should not hesitate to re-examine his own views and change his opinion if convinced it is erroneous; and (5) that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

In an effort to alleviate possible interference with the deliberation of jurors, §5.4 (b) provides that when, in the exercise of his discretion, the trial justice concludes that it is necessary to recharge the jury under circumstances like those presented by the instant case, he may do nothing more than repeat those instructions set out in subsection (a). Without intending to limit the discretion of the trial justice in the matter of instructing jurors as to their duty to seek verdicts in criminal trials, we suggest that consideration be given to compliance with the provisions of §5.4 (a) and (b).

Further, defendant alleges prejudice in the charge, inasmuch as the trial justice fixed a specific period of time in

54

which the jury could continue its deliberations.[9] There is authority which provides that a fixed period for deliberation by the jury is coercive in that it places pressure upon the members of the jury to reach a decision before a fixed deadline. *Goff* v. *United States,* 446 F.2d 623 (10th Cir. 1971); *Burroughs* v. *United States,* 365 F.2d 431 (10th Cir. 1966). However, in both *Goff* and *Burroughs* the jury had returned guilty verdicts within the time period set and, having concluded that that verdict may have been prompted by a desire to reach a decision within the period fixed by the trial justice, the court in each case reversed the guilty verdict.

The dialogue between the trial justice and jury in this case set out in note 9, *supra,* clearly indicates that the trial justice's action in fixing the period for continued deliberation did not prompt a verdict of any kind. All of the verdicts which were finally returned had been determined, according to the foreman's answers, before the trial justice set a time limit on the deliberations. Therefore, there is no justification in suggesting that the time limitation prompted the guilty verdict which is now before us under this bill of exceptions.

### XI. Armed Marshals in the Courtroom

The defendant alleges that the trial justice committed prejudicial error in permitting the removal of the jury from the courtroom while the state's witness, John Kelley, was escorted into the courtroom by U. S. marshals and in allowing those marshals to stand nearby during the course of Kelley's testimony. The defendant contends that the marshals' presence created a circus-like atmosphere designed to impress the jury with the importance of this

---

[9]At the conclusion of the disputed charge, the trial justice said: "[Y]ou go back upstairs for a reasonable time and at the end of that time I'll send you another note, after three quarters of an hour perhaps."

particular witness and the notorious reputation of defendant.

In *McDonald* v. *United States*, 89 F.2d 128, 136 (8th Cir. 1937), the Eighth Circuit established what appears to be a salutary rule to govern situations such as the one presented by these facts. The court said: "It is too obvious for argument that hardly any other matter can better be relegated to the discretion of the trial court than that of safeguarding the court, counsel, jury, and spectators, and assuring the continued presence and attendance of the accused at the trial. Absent incontrovertible evidence of hurt, the trial court should be permitted to use such means, to secure the named ends, as the nature of the case, the known criminal record, character, associates in crime, and reputation of the accused shall reasonably call for * * *." *Accord, Leyvas* v. *United States*, 264 F.2d 272, 277 (9th Cir. 1958).

The transcript indicates that the trial justice was keenly aware of the necessity to balance the need for reasonable security with the rights of defendant to receive a fair trial. At the request of counsel for defendant, he made certain that none of the weapons carried by the marshals were visible to the jury. In view of all of the circumstances, there is no basis for us to conclude that the trial justice abused his discretion in permitting the U. S. marshals to be present during the course of Kelley's testimony.

In addition, we believe that the defendant's contention that the statement of Robert E. Sheehan, a special agent of the FBI, that the witness Kelley was "under the protection of the United States of America" was so prejudicial as to constitute reversible error is without merit. While there is some merit in the contention that such a statement has little relevance within the context of Sheehan's testimony, we are hard pressed to believe that this statement, standing alone, created prejudice in the minds of

the jurors sufficient to preclude them from reaching a fair and impartial verdict. These exceptions are without merit.

All of the exceptions of the defendant are overruled, the judgment of conviction is sustained, and the case is remitted to the Superior Court.

Petition to reargue denied.

Mr. Justice Powers participated in the decision but retired prior to its announcement. Mr. Justice Paolino, Mr. Justice Joslin, and Mr. Justice Doris did not participate.

*Richard J. Israel*, Attorney General, *Donald P. Ryan*, Asst. Attorney General, for plaintiff.

*Harris Berson, Frank A. Mazzeo, Harvey Brower*, Swampscott, Mass., *Robert Napolitano*, Portland, Maine, for defendant.