STATE

v.

Kenneth VIVEIROS.

No. 2009–246–C.A.

Supreme Court of Rhode Island.

July 6, 2012.

Christopher R. Bush, Department of Attorney General, for State.

C. Eric Marion, Esq., for Defendant.

Present: SUTTELL, C.J.,
GOLDBERG, FLAHERTY, ROBINSON,
and INDEGLIA, JJ.

## OPINION

Justice GOLDBERG, for the Court.

This case presents a rare look into the dark side of prison life and the human cost and institutional consequences that result when rogue correctional officers deviate from established prison standards. The defendant, Kenneth Viveiros (defendant or Viveiros), is before the Supreme Court on appeal from a conviction on four counts of simple assault against three inmates at the

Adult Correctional Institutions (ACI), occurring while the defendant was employed as a lieutenant at the ACI. On appeal, the defendant asserts that the trial justice: (1) abused his discretion in denying the defendant's motion to sever his trial from that of his codefendant, Captain Gualtar Botas (Botas); (2) abused his discretion in granting the state's motion *in limine,* precluding defense testimony from inmate Sebastian Atryzek (Atryzek); (3) erred by giving improper jury instructions; and (4) erred in denying the defendant's motion for a new trial based on the insufficiency of the evidence. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## Facts and Travel

The defendant was employed by the Rhode Island Department of Corrections for over twenty-six years and, at the time of the alleged incidents in 2006, held the rank of lieutenant, assigned to the 7 a.m. to 3 p.m. shift at the minimum security facility.[1] Viveiros's duties as lieutenant included conducting hearings, characterized as discipline boards, for inmates who were accused of violating prison rules.[2] However, as the facts disclose, there were no hearings in this case. Between December 2005 and February 2006, minimum security correctional officers collected evidence suggesting that ACI inmates Robert Houghton (Houghton), Anthony Romano (Romano), and Jose Gonzalez (Gonzalez) independently had violated various prison rules. Each offending inmate was taken to the office of Botas—the highest ranking uniformed officer and shift commander for

---

1. The minimum security facility also houses inmates who are assigned to the prison's work-release program.

2. The defendant testified that being in charge of the discipline boards involved bringing the offending inmates into an office, reading them

the booking charge, obtaining their plea to the charge, and providing them an opportunity to present their side of the story. If the inmate was guilty of the charged offense, Viveiros would impose a punishment.

the 7 a.m. to 3 p.m. shift at the minimum security facility—to meet with Botas and defendant regarding their infractions. Correctional officer Ernest Spaziano, Jr. (Spaziano) was present during the Houghton and Gonzalez meetings. Each of the three complaining witnesses testified that, during these meetings, the correctional officers physically assaulted and abused him in order to obtain information about suspected illegal or prohibited activity.

The incident involving Houghton allegedly occurred on December 23, 2005. At trial, Houghton testified that he was brought from the "bubble"[3] to Botas's office where Botas, Viveiros, and Spaziano were waiting for him. During the interrogation into whether Houghton had any information about an incident involving another inmate on Houghton's work crew suspected of misconduct, Houghton claimed that when he was unable (or unwilling) to provide the information the officers wanted, Botas and Viveiros physically assaulted him. Houghton testified that after Botas hit him on the head with a telephone book, the officers began laughing and, as the interrogation continued, Viveiros backhanded him in the head.[4] After being interrogated, Houghton was returned to the bubble, where he was forced to wait for some time before he was allowed to return to his room. Three inmates were in Houghton's room when he returned. Although Houghton testified that he told the inmates that his face was red because Botas and Viveiros had assaulted him, he did not report the incident to anyone at the prison or in law enforcement for fear of retaliation. Houghton

disclosed the incident to the state police when they approached him in February 2006, after another correctional officer had reported that Houghton had been overheard discussing the assault.

The incident involving inmate Romano allegedly occurred on January 30, 2006. Upon returning from his work-release job several days earlier, Romano entered the bubble and was searched in accordance with standard protocol. A search of Romano's pockets produced a slip of paper containing a telephone number. The officer seized the piece of paper, and Romano was allowed to return to his room. Several days later, Romano was summoned to the front of the building and then instructed to proceed to the bubble—where he was detained for several hours—before Viveiros escorted him to Botas's office. Viveiros and Botas asked Romano questions about the paper with the telephone number, including where it came from and whose number it was. Romano testified that he attempted to answer the questions as best he could, but he felt as though no answer was satisfactory. According to Romano, Viveiros threatened to hit him if he did not provide correct answers. Disbelieving Romano's responses, Viveiros twice hit him on the head with a plastic clipboard and then hit him with a telephone book, again on the head. Romano testified that Botas and Viveiros were laughing and joking during the interrogation and that he felt helpless and unable to defend himself because, in his words, "what are you going to do * * * you will be in [the ACI] the rest of your life; you will be all done." When the questioning ended, Romano was

---

**3.** The "bubble" is the colloquialism used by inmates and correctional officers to describe the holding cell area in the Adult Correctional Institutions' (ACI) Minimum Security Center. The inmates are brought to the bubble before and after leaving the facility, or if they are waiting to be seen by a correctional officer in

the facility; inmates are often searched in this holding area.

**4.** The officers also ridiculed Houghton about his deceased wife, and they forced him to watch and sing along with an online video.

taken back to the bubble for a period of time. After attempting to call the telephone number found on Romano's person, defendant again retrieved Romano from the bubble and escorted him back to Botas's office. This time, Botas and Viveiros accused Romano of "pulling [their] chains" and began yelling and swearing, accusing him of lying. Botas grabbed Romano and pushed him into a filing cabinet, yelling and calling him names. Romano stated that he felt defenseless and that the officers continued to threaten to send him to another facility or harm him. Romano was informed that he would be sent to the segregation area known as "loss of all privilege" or LOAP, but he first was returned to the bubble. While there, an emotional Romano disclosed to an inmate what had happened and how the officers had treated him.

After waiting in the bubble for a few more hours, Romano was escorted to Viveiros's office, where Botas slammed him into a chair and Botas and Viveiros encouraged Romano to disclose the truth about the telephone number's origin and purpose. The defendant and Botas continued to joke and threaten Romano during this third encounter. Botas then read Romano the booking, which Romano signed because he "just wanted to get out and get done with whatever I had to get done with." When he returned the booking papers to Botas's office, the atmosphere changed and Botas and Viveiros acted "like nothing ever happened," like they were all best friends. The officers asked Romano if he was "clear about everything that happened" and Romano responded that "nothing happened to me today." Botas replied "all right, good good."[5] Although Romano did not discuss the inci-

dent for several days, eventually he spoke with an inmate known as "Delo." Inmate Delo Davis testified that Romano was taken out of the bubble two times on the day of the incident and that when he returned the first time, Romano was shaken up and his "face was like red over his eye area."

The incident involving inmate Gonzalez was alleged to have occurred on February 14, 2006. The evening before, there was a scuffle among nine inmates on Gonzalez's floor. Because Gonzalez was suspected of being involved in the altercation, he was ordered to the bubble. Upon returning to his room from the bubble, Gonzalez discovered that food he stored in a locker was missing. Gonzalez was told that his food had been confiscated and taken to Botas's office and that he was to bring proof that he purchased the food to Botas's office the next morning. When Gonzalez went to Botas's office, he knocked on the office door and addressed Botas as "lieutenant" instead of captain—a mistake that proved costly. In response to being addressed as lieutenant instead of captain, Botas got "very angry" and smacked Gonzalez in the face. Both defendant and Spaziano were present.

Once inside the office, Gonzalez noticed his bag of food on the floor. He was told to sit down and place his hands on the top of the desk. The officers began asking him about gangs, drugs, a man named Will Mendez, and the identity of the person smuggling cigarettes and contraband into the facility. Gonzalez was told that if he did not answer, he would get hit with a telephone book or a ream of copy paper. At one point, Botas hit Gonzalez with the bag of food, causing its contents to spill out. As Botas interrogated Gonzalez, Spaziano would hold his arms, and Viveiros

5. Purportedly to make him "feel a little better," Botas showed Romano some inappropriate photos of young girls because he knew Romano had not seen female genitalia in some months.

would "grab a package of soup"—Ramen noodle soup—"and he [would] start smashing it on [his] head." After being struck with the copy paper and the Ramen noodle soup, Gonzalez began to cry because he had been assaulted for "no reason." When Gonzalez failed to answer Botas's questions about Will Mendez and stated that he was not going to talk, Botas hit him with a telephone book and he became "dizzy."

Inmate Warren Tarsagian (Tarsagian) testified at trial that he saw Gonzalez later that day and noticed a number of injuries that he did not have earlier that day, including a split lip and red face. Gonzalez also appeared shaken and nervous. According to Tarsagian, Gonzalez told him that he was struck in the face with a telephone book and packets of soup by the correctional officers. Tarsagian also testified that Gonzalez had told him that the correctional officers forced him to strip naked and that Botas had pulled his testicles. According to Tarsagian, Gonzalez appeared to be in a state of disbelief and shame. Several days later, Gonzalez disclosed this incident to a correctional officer identified as Officer Padula (an officer he knew and trusted) because he did not want these assaults to be repeated. Officer Padula advised Gonzalez that he was duty-bound to report the incident and his assault allegations to the appropriate prison officials. Gonzalez next reported the incident to a substance-abuse service employee at the Department of Corrections, Gwen Steverson (Steverson), another employee in whom he had confidence. Gonzalez informed Steverson about the details of the assault. She indicated that when she saw him, Gonzalez looked sad and tired, and that he had a split lip.

An investigation was initiated by the Rhode Island State Police, with the assistance and cooperation of the ACI administration. On May 4, 2006, the state police filed three criminal complaints charging Viveiros with four counts of simple assault against the three inmates, arising from events that occurred during the disciplinary board "proceedings." The defendant was charged with one count of simple assault against Houghton, two counts of simple assault against Romano, and one count of simple assault against Gonzalez. Viveiros and Botas were both alleged to have been present during the incidents involving Houghton, Romano, and Gonzalez; Botas additionally was charged with assaulting two other inmates—Matthew Gumkowski (Gumkowski) and Michael Walsh (Walsh). Spaziano was alleged to have been present during the Houghton and Gonzalez incidents and was charged with a single count of simple assault against Gonzalez. The cases were transferred to the Superior Court on February 6, 2007.

On November 19, 2007, the state's motion to consolidate the nine criminal complaints against Viveiros, Botas, and Spaziano was heard by a justice of the Superior Court. The trial justice carefully considered and weighed the risk of prejudice against the need for judicial economy. Concluding that the "charged offenses are of the same acts or transactions," the trial justice determined that "Botas and Viveiros will not be substantially prejudiced by the joinder of their cases into one trial." However, the trial justice also found that Spaziano—who faced a single count of assault—would face "a serious likelihood of substantial prejudice" were the court to order joinder. The trial justice declined to join Spaziano's case with that of Botas and Viveiros, and noted that "two trials are certainly more economical than nine, and that the witnesses and evidence necessary to prove the charges against defendant Spaziano do not substantially overlap with

the evidence needed to prove the cases against the other defendants."[6]

Viveiros and Botas subsequently moved to sever their cases. On June 27, 2008, the trial justice considered dual pretrial motions to sever by defendant and Botas pursuant to Rule 14 of the Superior Court Rules of Criminal Procedure. The defendants contended that a joint trial would result in real and substantial prejudice to each defendant. The trial justice noted that the focus of Viveiros's severance contention largely rested upon the state's intention to use evidence of prior bad acts pursuant to Rule 404(b) of the Rhode Island Rules of Evidence, arising from an alleged incident involving Botas, inmate Walsh, and human feces. The defendant also argued that he would be prejudiced if the jury heard evidence concerning assault allegations involving Walsh and Gumkowski because Viveiros was not charged with assaulting those inmates and because the allegations against Botas were "so powerful and inflammatory." The trial justice concluded that evidence of the alleged "feces incident" involving Walsh was highly prejudicial and would be inadmissible at Viveiros's trial. Based on the trial justice's concern that the jury "might misapply" Walsh's testimony, which he characterized as "particularly disgusting and offensive," the trial justice declared that the state could choose to either forfeit the use of the Rule 404(b) evidence relating to the "feces incident" at a joint trial, or the state could sever the Walsh counts and have them heard in a separate trial. The state elected to proceed against Botas and Viveiros jointly and to sever the Walsh complaint.

A seventeen-day jury trial commenced on July 8, 2008. On the fourteenth day of trial, after Tarsagian and Steverson testified for the state, the trial justice considered the state's *in limine* motion seeking to preclude Atryzek from testifying. The defense intended to present inmate Atryzek in order to attack Tarsagian's credibility, contending that Tarsagian had asked Atryzek to file a false allegation about Botas—an allegation that Tarsagian had denied while on the stand during cross-examination.[7] The state argued that admitting Atryzek's testimony would constitute extrinsic evidence on a collateral matter that is not permitted under Rule 608(b) of the Rhode Island Rules of Evidence. The trial justice agreed that Atryzek's testimony was, in fact, "extrinsic evidence on a collateral issue which is prohibited by [R]ule 608(b)" and that "the defendants are stuck with Mr. Tarsagian's answers he gave on cross-examination."

Both defendant and Botas testified at trial. With respect to the assaults on Houghton, defendant testified that he never was involved in an investigation of Houghton, that he never struck the inmate, and that he never witnessed Botas assault Houghton. Botas testified that he had no recollection of Houghton. Both defendant and Botas admitted involvement in the investigation of inmate Romano and the telephone number that was found on his person. However, each defendant denied that he, or anyone else, to his knowledge, assaulted Romano with a telephone book, bare hand, or plastic clipboard. The defendant and Botas also testified that they were involved in the Gonzalez investigation, but again denied that they or any

6. After his separately held trial, Spaziano was acquitted of the simple assault charge.

7. On cross-examination, the defense asked Tarsagian: "And isn't it lastly the case, sir, that you tried to enlist the help of another inmate, Sebastian Atryzek to lie on your behalf against Captain Botas to support your claim of assault?" Tarsagian's response was: "That is not true."

other correctional officer, to their knowledge, assaulted the inmate in any way.

The trial drew to a close on July 31, 2008, when the trial justice charged the jury. On August 1, 2008, the jury returned a guilty verdict against Viveiros for all four counts of simple assault.[8] The defendant subsequently filed a motion for a new trial, which was heard and denied on September 5, 2008. After recounting the testimony adduced at trial and assessing the credibility of the witnesses, the trial justice determined that, although there were some inconsistencies in testimony, it was "a classic case where individuals come to different conclusions [and] that reasonable minds could differ in this case." As such, the trial justice denied the motion and proceeded to sentence Viveiros.[9] Judgments of conviction were entered on December 16, 2008. The defendant appealed.

On appeal, defendant argues that the trial justice erred by: (1) refusing to sever his trial from that of his codefendant, Botas; (2) granting the state's motion *in limine*, precluding the testimony of inmate Atryzek; (3) giving improper jury instructions; and (4) denying defendant's motion for a new trial because the evidence was insufficient to support a finding of guilty.

8. The jury also found Botas guilty on all counts.

9. The sentence was imposed as follows: one year at the ACI, three months to serve, nine months suspended, for simple assault against Houghton; one year at the ACI, three months to serve, nine months suspended, with probation, for simple assault against Romano, consecutive to the sentence imposed for the assault against Houghton; one year at the ACI, suspended, with probation, for the second count of simple assault against Romano, to run concurrently; one year at the ACI, three months to serve, nine months suspended, with probation, for simple assault against Gonzalez, to run consecutive to the sentences imposed for assaults against Houghton and Ro-

## Analysis

### The Motion to Sever

The defendant contends that the trial justice abused his discretion by denying Viveiros's motion to sever his trial from that of his codefendant, Botas.[10] The defendant primarily argues that he was prejudiced by this ruling because the state's allegations against Botas were more severe than those against defendant. He alleges that the "cumulative effect of the degree of abuse alleged against Botas combined with the additional [complaining witnesses] in the Botas case is cause for great concern and is sufficient basis [to] believe that the lower court abused its discretion in denying [defendant's motion to sever]."

■■■■ "[A] defendant is not entitled to a severance as a matter of right." *State v. Hernandez*, 822 A.2d 915, 920 (R.I.2003) (quoting *State v. Verrecchia*, 766 A.2d 377, 386 (R.I.2001)). "[T]he ruling on a motion to sever lies within the discretion of the trial justice." *State v. Gibbons*, 418 A.2d 830, 835 (R.I.1980) (citing *State v. Patriarca*, 112 R.I. 14, 28, 308 A.2d 300, 310 (1973)). "This [C]ourt will overturn a trial justice's denial of severance only upon the defendant's affirmative showing 'that he [or she] has in fact suffered prejudice suf-

mano. The trial justice added that "[t]he intention is to sentence [Viveiros] to a total of nine months to serve of the three-year sentence."

10. Rule 14 of the Superior Court Rules of Criminal Procedure provides in pertinent part:

"If it appears that a defendant or the State is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires."

ficiently substantial to impinge upon his [or her] right to a fair trial.'" *State v. Clarke*, 448 A.2d 1208, 1209 (R.I.1982) (quoting *Gibbons*, 418 A.2d at 835). "Whether the defendant has shown that he [or she] has suffered substantial prejudice is determined by balancing 'efficiency and convenience in judicial administration on the one hand and the defendant's right to a fair trial without prejudice on the other.'" *State v. Pereira*, 973 A.2d 19, 28 (R.I.2009) (quoting *State v. Day*, 898 A.2d 698, 705 (R.I.2006)). Such substantial prejudice can potentially occur in the following circumstances:

> "(1) [The defendant] may become embarrassed or confounded in presenting separate defenses; (2) the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the other crime or crimes charges; or (3) the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find." *State v. Goodreau*, 560 A.2d 318, 321–22 (R.I.1989) (quoting *Patriarca*, 112 R.I. at 30, 308 A.2d at 311).

"It is not sufficient for a defendant to cite the potential for prejudice." *State v. Bernier*, 491 A.2d 1000, 1003 (R.I.1985). Nor is it "sufficient for a defendant to simply contend that he [or she] might have had a better opportunity for an acquittal had he [or she] been tried separately * * *." *State v. Bustamante*, 756 A.2d 758, 767 (R.I.2000) (citing *United States v. Leonard*, 494 F.2d 955, 968 (D.C.Cir.1974)).

■ A thorough review of the record fails to disclose that Viveiros sufficiently demonstrated that the denial of his motion to sever resulted in prejudice, such that he was deprived of a fair trial. Initially, when he granted the state's motion for joinder, the trial justice found that the technical requirements for joinder were satisfied because the charged offenses arose from the same acts or transactions or series of acts or transactions and that "therefore, the cases may be joined unless this Court finds risk of substantial prejudice outweighs the economic concerns." After reflecting upon the potential for prejudice, the trial justice concluded that defendants Botas and Viveiros would not substantially be prejudiced by the joinder of their cases into one trial. As noted, the trial justice found that Spaziano would suffer substantial prejudice if his case was joined with that of Viveiros and Botas. The trial justice then ordered that two trials be held: one for Spaziano, and one for Botas and Viveiros.

In seeking a severance, defendant primarily argued to the trial justice that the introduction of testimony from inmate Walsh—involving Botas and human feces—would substantially prejudice him because the evidence was admissible only against Botas and was limited to Rule 404(b) evidence. Viveiros argued that the incident was extremely inflammatory and that, in addition to the charges he faced, he would have to defend himself from the evidence against Botas. The trial justice agreed with these contentions; recognizing that the Walsh incident was "particularly disgusting and offensive" and constituted a substantial likelihood of prejudice to Viveiros. Cognizant of this risk, as well as the heavy burden the prosecution and the judiciary would have to bear if required to hold separate trials, the trial justice declared that the state could either forfeit introducing the prejudicial evidence at a joint trial on all of the criminal charges against Viveiros and Botas or could opt to use the feces evidence in a separate trial at which the complaint against Botas involving Walsh and the feces incident would be heard. The state elected the latter option, and the complaint against Botas alleging

assault upon Walsh was severed. We are satisfied that the risk of prejudice to defendant was avoided by this balanced ruling.

After reviewing the trial justice's careful ruling, in which he declined to join Spaziano's case, and his diligent efforts to avoid prejudice to Viveiros, we conclude that the trial justice did not abuse his discretion by refusing to sever defendant's case from that of Botas. We note additionally that the verdict form presented to the jurors clearly delineated the specific acts of assault with which each defendant was charged, thereby reducing further any potential for jury confusion.[11] We are satisfied that the trial justice acted well within his discretion when he severed the case he believed would create prejudice, thus precluding inflammatory Rule 404(b) evidence from being heard in the joint trial, but denied any further severance.

### The Motion *In Limine*

 The defendant assigns error to the trial justice's decision granting the state's motion *in limine* to exclude the testimony of Atryzek; defendant argues that he was deprived of the opportunity to impeach Tarsagian and that this ruling amounted to prejudicial error.

The state called inmate Tarsagian to testify at trial. Tarsagian testified that he was in contact with Gonzalez while he was serving his sentence in minimum security and that, on the day that Gonzalez was assaulted, he noticed that Gonzalez had a split lip, his face was red, and he appeared shaken up. According to Tarsagian, Gonzalez told him that he had been interrogated by Botas and Viveiros and that he had been assaulted. On cross-examination, the witness was asked whether he had ever told an inmate named Atryzek that they could both profit by filing a false assault allegation against Botas, to which Tarsagian responded: "Never told him anything like that." The defendant proffered Atryzek in order to impeach Tarsagian by rebutting this testimony. Defense counsel advised the trial justice that Atryzek was prepared to testify that Tarsagian approached him and suggested that they file an assault complaint against Botas and that Atryzek should falsely state that he observed the assault so "they would both profit from the lawsuit." The trial justice agreed with the state's position that Atryzek's testimony would be extrinsic evidence on a collateral issue, which would be prohibited by Rule 608(b).[12] The trial justice reasoned that Tarsagian was effectively cross-examined, that Tarsagian was not the alleged victim—he was merely a corroborating witness, and that Atryzek's testimony was not admissible.

 "When reviewing the grant or denial of a motion *in limine*, this Court

11. The verdict sheet presented the jurors with two sections—one section pertaining to all of the alleged incidents committed by Botas and another section pertaining to all of the alleged incidents committed by Viveiros. Each charge provided the date the alleged incident occurred, the name of the alleged victim involved in that charge, and how the alleged assault was committed.

12. Rule 608(b) of the Rhode Island Rules of Evidence provides in relevant part:

"*Specific Instances of Conduct.* Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, or, in the discretion of the trial judge, evidence of prior similar false accusations, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified."

will consider only whether the challenged evidence was proper and admissible and, if not, whether there was sufficient prejudice to constitute reversible error." *State v. Scanlon*, 982 A.2d 1268, 1274 (R.I.2009) (quoting *State v. Gomes*, 881 A.2d 97, 111 (R.I.2005)). It is well-established that "[a] witness may not be impeached on collateral matters by the introduction of extrinsic evidence. The cross-examiner is restricted to the answers of the witness." *State v. Tutt*, 622 A.2d 459, 462 (R.I.1993) (quoting *State v. Brown*, 574 A.2d 745, 749 (R.I. 1990)). "Evidence is not collateral if the evidence is admissible for a reason other than to contradict the witness's testimony." *Scanlon*, 982 A.2d at 1275 (citing *State v. Martinez*, 824 A.2d 443, 449 (R.I. 2003)).

■■■ Clearly, Atryzek's proposed testimony constituted extrinsic evidence, the sole intent of which was to contradict Tarsagian's testimony. The record reveals that Tarsagian had been asked whether he had discussed filing a false allegation against Botas, and he denied having done so. We are satisfied that the trial justice did not err when he concluded that the testimony was inadmissible, nor did he abuse his discretion in excluding the evidence.[13]

### The Jury Instructions

■■■ The defendant avers that the trial justice failed adequately to instruct the jury that it should consider the charges against Viveiros separately from the allegations against Botas. The defendant takes issue with the instructions, arguing that they were "incomprehensible" and "confusing" because the jury could not properly separate the codefendants, could not properly apply the disparate evidentiary record to each defendant, and could not have understood the instructions as they were presented. The defendant also contends that the trial justice erred because no clear instruction was given to the jurors that they must separately distinguish the charges against Viveiros from those against Botas. However, defendant failed to make these objections at the time of trial.

■■■ This Court's " 'raise-or-waive' rule precludes our consideration of an issue that has not been raised and articulated at trial." *State v. Bido*, 941 A.2d 822, 828 (R.I.2008). The objection also must be "sufficiently focused so as to call the trial justice's attention to the basis for said objection * * *." *State v. Toole*, 640 A.2d 965, 972 (R.I.1994) (quoting *State v. Warren*, 624 A.2d 841, 842 (R.I.1993)). Moreover, Rule 30 of the Superior Court Rules of Criminal Procedure provides in pertinent part that "[n]o party may assign as error any portion of the charge or omission therefrom unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection." *See State v. Hallenbeck*, 878 A.2d 992, 1006 (R.I.2005). Counsel's objection to the jury instruction must be made before the jury retires because "once alerted to the perceived error in the instruction that has been given, the trial justice has an opportunity to cure the alleged deficiencies before the jury retires

---

13. Alternatively, defendant asserts that the extrinsic evidence is independently admissible under Rule 613(b) of the Rhode Island Rules of Evidence because the witness must be given an opportunity to explain or deny a prior inconsistent statement. We need not address this contention because defendant at no time raised this as grounds for objecting to the state's motion to preclude testimony. Therefore, defendant failed to properly preserve the issue for appeal. *See State v. Bido*, 941 A.2d 822, 828 (R.I.2008) (holding that failure to raise an issue at trial precludes this Court from considering it on appeal).

for deliberations." *State v. Crow,* 871 A.2d 930, 935 (R.I.2005) (citing *State v. Hanes,* 783 A.2d 920, 924 (R.I.2001)).

The record discloses that defendant posited a single objection to that portion of the proposed instructions relating to Rule 404(b) evidence. Counsel for Botas objected to the state's request for an instruction about the use of prior bad acts evidence to establish whether defendants had a common scheme or plan with respect to the inmates. Botas's counsel objected by stating,

> "I would object obviously to the [Rule] 404(b) instruction as there has been no evidence of a common plan scheme or design sufficient for the Court to give that instruction that these counts should all rise and fall on their own merit, and I would as an oral motion in limine [move] * * * that if that instruction is not given that the State should be precluded from arguing that those cases may support each other."

The defendant joined in this objection, and the objection was sustained.[14] However, no objection was raised, at any time, suggesting that the instructions were inappropriate or failed adequately to cover the law; nor was there an objection about how the jury should be advised to independently evaluate the charges against the two defendants. The defendant's appellate contention that the objection to the Rule 404(b) instruction somehow included an additional objection asserting that the trial justice failed to instruct the jury to consider the charges against each defendant separately simply is incorrect. The record also discloses that, save for the Rule 404(b) objection, neither attorney objected to any portion of the court's instructions. By failing to raise a proper objection, defendant

deprived the trial justice of any opportunity to remedy possible deficiencies in the instructions before they were delivered. *See Crow,* 871 A.2d at 935. This issue was waived.

Although we are of the opinion that Viveiros is precluded from arguing that the trial justice failed adequately to instruct the jury because defendant failed to object at trial, we are nonetheless satisfied that the jury instructions—even had they been objected to in a timely fashion—were proper. We observe that the trial justice instructed the jury on the legal principles to be applied to the issues raised in the case and he "adequately cover[ed] the law." *State v. Imbruglia,* 913 A.2d 1022, 1030 (R.I.2007) (citing *State v. Ensey,* 881 A.2d 81, 95 (R.I.2005)).

### The Motion for a New Trial

The defendant lastly argues that the trial justice erred in denying his motion for a new trial. Viveiros contends that the complaining witnesses—Gonzalez, Romano, and Houghton—were not credible and that their testimony was the only evidence linking defendant to the assault charges, such that the weight of the evidence does not support a finding of guilt.

"[W]hen a defendant contends that the verdict is against the weight of the evidence, the trial justice must sit as 'the legendary thirteenth juror,' exercising his or her independent judgment in weighing the evidence and passing on the witnesses' credibility." *State v. Karngar,* 29 A.3d 1232, 1235 (R.I.2011) (quoting *State v. Clark,* 974 A.2d 558, 569 (R.I.2009)). In carrying out the role of the thirteenth juror, "the trial justice must (1) consider the evidence in light of the jury charge, (2)

---

14. The trial justice refused to charge the jury on Rule 404(b) of the Rhode Island Rules of Evidence because the trial justice determined that such an instruction would confuse the jury and because it was not "truly [Rule] 404(b) type evidence."

independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." *State v. Morales*, 895 A.2d 114, 121 (R.I.2006) (citing *State v. Banach*, 648 A.2d 1363, 1367 (R.I. 1994)). "If the trial justice concludes that he or she would have reached the same result as the jury did or that reasonable minds could differ as to the result, the motion for a new trial must be denied." *Imbruglia*, 913 A.2d at 1028 (citing *State v. Dyer*, 813 A.2d 71, 75 (R.I.2003)). This Court accords great deference to a trial justice's ruling on a motion for a new trial "if he or she has set forth sufficient reasoning in support of the ruling." *State v. Abdullah*, 967 A.2d 469, 479 (R.I.2009) (quoting *Imbruglia*, 913 A.2d at 1028). This Court will not disturb the ruling "unless the trial justice overlooked or misconceived material evidence relating to a critical issue or * * * was otherwise clearly wrong." *State v. Nunes*, 788 A.2d 460, 464–65 (R.I.2002); *see Banach*, 648 A.2d at 1367.

After a thorough review of the record before us, we are satisfied that the trial justice engaged in a comprehensive and proper analysis of the evidence presented in this case; he reviewed the testimony from both sides and independently assessed the credibility of the witnesses. *See Banach*, 648 A.2d at 1367 (holding that the trial justice properly reviewed the evidence and weighed the credibility of the witnesses). We recognize, as did the trial justice, that the task of weighing the credibility of the witnesses was challenging because most of the state's witnesses were convicted criminals with storied histories and the witnesses for the defense primarily consisted of sworn correctional officers, several of whom had worked together at the ACI for many years.

In passing on the credibility of the complaining witnesses, the trial justice stated that he had "not overlooked the many inconsistencies with respect to prior statements, prior testimony that was highlighted by both defense counsel with respect to those witnesses." However, in evaluating the credibility of the witnesses and the weight of the evidence, he found it necessary "to balance and consider those inconsistencies with the unique atmosphere of life inside the walls of a prison." The trial justice declared that,

"it was clear from the testimony of a number . of witnesses, including Ms. St[e]verson and Kim Mallett the investigator for the ACI, that there is always the reluctance to come forward, whether it be staff or inmates and that there is always the ever present possibility of some type of retribution, whether it be from the inmate population or law enforcement[,] * * * so it is not a typical atmosphere where people can come forward as you can in normal society."

Similarly, with respect to the testimony provided by Viveiros and the other correctional officers, the trial justice looked to the distinctive framework of this case that arose "from inside the walls of the [ACI] and these are fellow correctional officers * * * [and] you must look at their testimony from the [perspective] of being fellow officers with the defendants where they might have some desire to color their testimony favorably to the defense's version of events."

The trial justice remarked that he found Rhode Island State Police Detective Joseph F. Philbin (Det. Philbin) credible and that his testimony cast additional light on the dichotomy between correctional officers and inmates. The trial justice acknowledged the "very difficult position" that Det. Philbin was in while investigating this case because "[h]e ha[d] to go in and

**1246**

investigate a fellow division of law enforcement."[15]

After conducting an in-depth review of the testimony, including that of the defendant, the trial justice declared this to be a

"classic case where individuals come to different conclusions that reasonable minds could differ in this case. [The jurors] had a choice. They either believed the defendants and the witnesses that were submitted in support of their defense or they believed the inmates and witnesses that supported their version of the events. * * * I think the evidence weighed credibly and favorably as to the inmates['] version of events but giving its fairest evaluation, it is a classic case that reasonable minds could differ."

After finding that the testimony was such that reasonable minds could differ, the trial justice properly denied Viveiros's motion for a new trial. *See State v. Otero,* 788 A.2d 469, 472 (R.I.2002) (holding that if a trial justice finds that reasonable minds could differ after conducting an independent review, the motion for a new trial should be denied). In light of our review of the record and giving appropriate deference to the trial justice's decision—including his credibility findings, we hold that the trial justice neither overlooked nor misconceived material evidence, nor was he otherwise clearly wrong. *See Nunes,* 788 A.2d at 464–65. Thus, we conclude that the trial justice did not err in denying the defendant's motion for a new trial.

### Conclusion

For the reasons set forth in this opinion, we affirm the Superior Court's judgment

of conviction. The papers in this case may be remanded to the Superior Court.

---

15. Detective Philbin described the reception he received at the ACI as an investigator as unwelcome, cold, and lacking in cooperation from both the correctional officers and inmates. Although Det. Philbin's interaction with the officers he was investigating was tense and difficult, we credit Det. Philbin, the state police, and Investigator Kim Mallett and the ACI officers, administrators, and employees who were instrumental in gathering information, conducting the investigations, and protecting the inmates.