February 16, 2021

State                          :

    v.                          :

Jonathan Phillips.              :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email: opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| Jonathan Phillips. | : |

Present: Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.** This case came before the Supreme Court on December 3, 2020, on appeal by the defendant, Jonathan Phillips, from a judgment of conviction entered in the Superior Court following a jury verdict of guilty on six counts of first-degree child molestation sexual assault, in violation of G.L. 1956 §§ 11-37-8.1 and 11-37-8.2; three counts of second-degree child molestation sexual assault, in violation of §§ 11-37-8.3 and 11-37-8.4; and one count of second-degree child abuse, in violation of G.L. 1956 § 11-9-5.3(b)(2).

- 1 -

These charges arose from a series of sexual assaults from 2011 through 2013 upon the defendant's then-girlfriend's daughter, Hillary, and Hillary's cousin, Katie.[1]

On appeal, defendant challenges the trial justice's denial of his motion for a new trial, and he also argues that evidence of prior bad acts was admitted without a proper limiting instruction to the jury. For the reasons set forth in this opinion, we affirm the judgment of conviction.

**Facts and Travel**

By way of background, defendant met Palma Sardinha[2] in 2009, and, shortly thereafter, the two became romantically involved. Sardinha had two children; a daughter, Hillary, one of the complainants in this case, and a son, Anthony. Sardinha and her children lived in a third-floor apartment on Woodbine Street in Cranston, Rhode Island. Sardinha's mother, Patty Camacho, lived in the apartment on the first floor. The defendant moved into the third-floor apartment with Sardinha and her two children in March 2010. Hillary was eight years old at the time. Hillary's slightly older cousin Katie, the second complainant in this case, would often visit the Woodbine Street apartment for sleepovers. In March 2011, Sardinha and defendant welcomed a child, Thomas.

---

[1] In order to protect the identity of the complainants and minor family members, we refer to them by pseudonyms in this opinion.

[2] In the trial transcripts, Palma Sardinha is sometimes referenced by her former last name, Camacho. For clarity's sake, we use her current last name.

In 2013 Hillary and Katie came forward with allegations of child molestation and sexual abuse by defendant. As a result, on April 7, 2014, defendant was charged by criminal information in P2/14-913A with four counts of second-degree child molestation sexual assault, in violation of §§ 11-37-8.3 and 11-37-8.4. Additionally, in 2015, Hillary and Katie came forward with additional allegations of first-degree child molestation sexual assault against defendant. In 2016, defendant was charged by grand jury indictment in P1/16-736A with ten counts of first-degree child molestation sexual assault, in violation of §§ 11-37-8.1 and 11-37-8.2, and one count of second-degree child abuse, in violation of § 11-9-5.3(b)(2). The two cases were consolidated for trial.[3] In accordance with Rule 48(a) of the Superior Court Rules of Criminal Procedure, the state dismissed one count of second-degree child molestation charged in the 2014 information and four counts of first-degree child molestation set forth in the 2016 indictment. The cases proceeded to trial in April 2018.

---

[3] Pursuant to an order entered by this Court on March 6, 2020, these two cases were also consolidated on appeal.

The state presented testimony from Sardinha and from the complainants, Katie and Hillary.[4] The testimony revealed horrific facts arising from multiple incidents of sexual assault by defendant upon these complainants.

**Katie's Testimony**

Katie testified that she was very close to both her aunt, Sardinha, and her cousin, Hillary. She would frequently spend weekends and school breaks at Sardinha's apartment and would stay in Hillary's room. Her grandmother, Patty Camacho, lived on the first floor. Katie explained that the family dynamic changed after defendant arrived. She remembered that defendant would often watch the children while Sardinha and Camacho were at work and that he was "controlling and rude." According to Katie, defendant "tried to tell [Hillary] what to do * * * like he was her father and he wasn't." Katie testified that her relationship with defendant deteriorated when she was ten years old. She recounted six specific incidents of sexual abuse perpetrated by defendant.

The first assault occurred in Hillary's bedroom, when defendant appeared in the doorway and asked the girls if they wanted to play "Truth or Dare." Katie testified that the game "escalated to the dares getting worse, and it was touching." She explained that defendant touched her breasts under her clothes for a "few

---

[4] The state also proffered the expert testimony of Christine Barron, M.D., a doctor at the Aubin Center at Hasbro Children's Hospital who examined both Katie and Hillary.

minutes." The defendant threatened to "hurt [Katie's] family" if she disclosed the abuse.

Katie recounted the second incident of assault, when she returned to Woodbine Street for another sleepover with Hillary. She stated that defendant touched her breasts, both under and over her clothes. The third incident—again under the guise of Truth or Dare—led to defendant performing cunnilingus on ten-year-old Katie. At another sleepover on Woodbine Street, during a fourth episode, defendant instructed Katie to perform fellatio on him; in that episode, defendant went into Hillary's room and directed Katie, "put your mouth on it and move back and forth[.]"

Katie testified to a fifth incident that occurred when she was eleven years old, when defendant came into Hillary's room with a condom, locked the door, and engaged in penile penetration with Katie. She recalled that Hillary was in the room the entire time and that defendant did "[t]he same thing" to Hillary before he assaulted Katie. Katie also described a sixth incident that occurred in Hillary's room when Katie was eleven years old, during which defendant penetrated Katie with his fingers. Katie testified that the digital penetration by defendant would happen "[a]lmost whenever [she] would go there." Katie testified that there were numerous other occasions when defendant would force both Hillary and Katie to touch his penis and touch each other's breasts, while defendant watched.

When she was in the sixth grade, in January 2013, Katie disclosed defendant's abuse to a friend from school. After that, she told her teacher; the principal; guidance counselors; a representative from the Department of Children, Youth, and Families; police; and doctors. However, at that point, she had revealed only the incidents in which defendant had touched her breasts; she did not disclose the incidents of oral and penile penetration. Katie testified at trial that she decided to "only t[ell] them some things" because she "didn't want [Thomas] to grow up without a dad." After Katie initially reported the assaults, an angry Hillary claimed that Katie was lying about what happened. As a result, Katie's relationship with Hillary became strained, and all communication ceased. The estrangement was short-lived.

In February or March 2013, Hillary disclosed defendant's abuse to Sardinha, thus corroborating Katie's initial allegations; the girls' relationship improved. Katie resumed visiting Woodbine Street and spending vacations with Sardinha and her family. The defendant had returned to New York and was no longer part of their lives.

Over two years later, in May 2015, while on vacation with Hillary and Sardinha, Katie decided to tell Sardinha her "whole story." Katie divulged "[t]he entire secret" to her aunt, including the incidents of sexual penetration that both girls endured. Katie's motivation for revealing the whole story was born out of her

concern for Hillary; she testified that she waited two years because she feared defendant. Katie admitted that, between 2013 and 2015, she spoke with numerous people—including police and doctors—about defendant's abuse; but she was not completely honest and never told the full story until her 2015 disclosure.

**Hillary's Testimony**

Hillary testified that, when defendant moved into Woodbine Street, the two "were kind of friends[,]" and developed a sort of "stepfather and stepdaughter relationship." The somewhat friendly relationship changed after Thomas was born in March 2011. According to Hillary, defendant became "aggressive and mean[,]" and he would yell at her and throw things at her, such as glass plates and cups. She testified that defendant would also hit her on her arms, back, and thighs. Hillary refrained from telling Sardinha about defendant's behavior because she thought it was normal and "just punishment for being a bad kid."

In 2011 the nature of the relationship between defendant and Hillary changed once again, when defendant began touching her. Hillary was ten years old when defendant started playing the nefarious Truth or Dare game with her and Katie. She recalled that defendant would put his hands in her shirt and "touch [her] breasts and [her] vagina." Hillary also recounted a specific incident that occurred in 2012, shortly after her tenth birthday, when defendant called her into Sardinha's room, pushed her onto the bed, "ripped [her] shirt off and pushed [her]

skirt up and raped [her]." She recalled another incident that happened after her eleventh birthday, when defendant came into her room, sat next to her on her bed, and "slid his hands down [her] pants and started touching [her] vagina." He moved his hand around on the outside of her vagina but under her underwear.

The record discloses that, in light of Katie's allegations of sexual abuse, DCYF was assigned to investigate whether something similar happened to any other minor living with defendant. In February 2013, a DCYF investigator met with Hillary and asked her if defendant had inappropriately touched her. Hillary admitted at trial that she had lied during that interview, denying that defendant ever touched her. After the DCYF interview, Sardinha asked Hillary if anything inappropriate had happened with defendant, and Hillary told her that nothing had happened. Hillary also went to Hasbro Children's Hospital and again denied any inappropriate touching by defendant. Because Hillary denied any sexual abuse by defendant, the investigation was deemed closed.

Hillary testified that, a few days after the DCYF visit, defendant sexually assaulted her yet again. This time, Hillary was taking a shower when defendant came into the bathroom and pulled her out of the shower, causing her to fall onto the bathroom floor and crack one of the tiles. Hillary recalled "kicking and trying to push [defendant] away from her[,]" to no avail. She detailed that defendant "punched [her] in the face and then picked [her] up and threw [her] onto [her]

mom's bed and raped [her]." She stated that, in that moment, she was "terrified, but [she] was kind of used to it." Hillary did not tell anyone what happened, thinking that if she could keep the assaults a secret, "it would just be dropped." Hillary also testified that defendant touched her in myriad other ways, including oral penetration, digital penetration, and having her put "[her] mouth on him." She stated that these instances occurred both when she was alone and when her cousin Katie would sleepover at Woodbine Street.

According to Hillary, in early 2013, two weeks after the DCYF interview, she told Sardinha that defendant had touched her breasts, but she did not mention the oral and penile penetration. In response, Sardinha sent Hillary to stay with the neighbors for a couple of days and immediately ejected defendant from the Woodbine Street apartment. In 2015, after the vacation with Sardinha and Katie, Hillary met with an interviewer from Day One, a sexual assault and trauma center, and disclosed the sexual assaults, including penile penetration. Hillary also returned to Hasbro in October 2015, where she spoke with doctors and disclosed the sexual assaults.

### Sardinha's Testimony

Sardinha testified that she first learned of her niece Katie's allegations against defendant in February 2013 from her mother, Camacho, who lived in the first-floor apartment on Woodbine Street. Camacho mentioned something about

an "inappropriate game[,]" but Sardinha was unsure of specific details and assumed it was a misunderstanding. Sardinha confronted Hillary about Katie's allegations, and Hillary denied that anything inappropriate had happened. However, Sardinha confronted Hillary again in April 2013, and, that time, Hillary said that the allegations were true. After defendant left the Woodbine Street apartment, the DCYF investigator returned to the apartment, and Hillary admitted that defendant had been sexually abusing her for approximately two years, specifically by digital penetration and touching her breasts. Sardinha did not learn the full extent of the sexual abuse until Katie's disclosures in 2015. From the time of the first disclosure in 2013 until the full disclosure in 2015, Sardinha testified, Hillary "was really struggling"—she "was having a lot of nightmares * * * [and] was cutting herself[.]"

### Defendant's Testimony

The defendant testified in this case and denied engaging in any inappropriate sexual contact with either Katie or Hillary. He explained that he stepped into a fatherly role with Hillary and would spend a lot of time with her, "together as just friends" to foster that relationship.[5] He was introduced to Katie within a month of

---

[5] According to defendant, Hillary "had a serious want and desire to have a father[.]" He testified that he tried to be supportive by helping Hillary with her schoolwork, watching movies together, and going on walks together. He said that he would also drop Hillary off at school and pick her up so that she did not have to walk home alone.

meeting Sardinha, and, he testified, Katie would sleep over at the Woodbine Street apartment frequently. After Thomas was born, Sardinha returned to work, and defendant became the primary caretaker of the household; he would often look after Katie and Hillary during their playdates.

The defendant testified that, in February 2013, his and Sardinha's relationship began to deteriorate due to "financial stresses[.]" That same month, a DCYF investigator came to the house to speak to Hillary, and she informed defendant that someone made an allegation of child molestation against him. The defendant testified that he was upset and that he "didn't understand the reasons for the allegations[.]" Two months later, the allegations resurfaced, and Sardinha asked defendant to move out. The defendant did not argue with Sardinha; he "accepted the fact" that she wanted him to leave.

On May 3, 2018, the jury returned a verdict of guilty on all counts. The trial justice heard and denied defendant's motion for a new trial on May 24, 2018. For each of the three counts of second-degree child molestation charged in the 2014 criminal information, the trial justice sentenced defendant to concurrent terms of fifteen years to serve at the Adult Correctional Institutions. As to each of the six counts of first-degree child molestation set forth in the 2016 indictment, the trial justice sentenced defendant to seventy-five years at the ACI, with fifty-five years to serve and twenty years suspended, with probation. The sentence for four of

those counts was consecutive to the sentence imposed for count two of the 2014 criminal information. The sentence for the two remaining counts was to run consecutive to the sentences for the four previous counts. As to the charge of second-degree child abuse, the trial justice sentenced defendant to ten years to serve at the ACI, to run consecutive to the sentence for four counts of first-degree child molestation in the 2016 indictment and two counts of second-degree child molestation in the 2014 criminal information. The cumulative sentence imposed was 125 years to serve. The defendant timely appealed.

## Discussion

Before this Court, defendant assigns two errors of law: (1) the trial justice erred in denying defendant's motion for a new trial because she overlooked inconsistencies and biases in assessing the credibility of the complainants; and (2) the trial justice erroneously admitted evidence of prior bad acts without giving the jury a proper limiting instruction. We address each contention in turn and provide additional facts as necessary.

## Motion for a New Trial

The defendant contends that the trial justice erred in denying his motion for a new trial. Specifically, he argues that the trial justice overlooked numerous inconsistencies in the testimonies of the complainants and that she also overlooked the motive for the complainants to falsify their testimony.

## Standard of Review

"When a trial justice considers a motion for a new trial, he or she 'acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence.'" *State v. Perkins*, 966 A.2d 1257, 1260 (R.I. 2009) (quoting *State v. Cerda*, 957 A.2d 382, 385 (R.I. 2008)). "Specifically, 'the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury.'" *State v. Paola*, 59 A.3d 99, 104 (R.I. 2013) (brackets omitted) (quoting *State v. Vargas*, 21 A.3d 347, 354 (R.I. 2011)). "If, after conducting such a review, the trial justice reaches the same conclusion as the jury, the verdict should be affirmed and the motion for a new trial denied." *Id.* (quoting *State v. Heredia*, 10 A.3d 443, 446 (R.I. 2010)).

In reviewing a motion for a new trial, this Court accords "great weight to a trial justice's ruling" if he or she "articulated sufficient reasoning in support of the ruling." *State v. Rogers*, 207 A.3d 457, 461 (R.I. 2019) (brackets omitted) (quoting *State v. Kizekai*, 19 A.3d 583, 589 (R.I. 2011)). "A trial justice's determination will therefore be 'left undisturbed unless the trial justice overlooked or misconceived material evidence or otherwise was clearly wrong.'" *State v. Baptista*, 79 A.3d 24, 29 (R.I. 2013) (quoting *Paola*, 59 A.3d at 104).

## Analysis

After careful review of the record, we are of the opinion that the trial justice did not overlook or misconceive material evidence. The trial justice articulated more than adequate grounds for denying defendant's motion for a new trial. In her comprehensive bench decision denying defendant's motion, which spanned over eighteen pages of transcript, the trial justice reviewed the applicable standards, summarized the testimony adduced at trial, and thoroughly evaluated the credibility of the witnesses.

The trial justice acknowledged that this case turned on the credibility of the two complainants and, because he testified on his own behalf, the credibility of defendant. She found Katie to be quite credible, describing her testimony as "sincere" and "compelling." She assessed the inconsistencies raised by defendant, particularly Katie's change of story from 2013 to 2015, and found that

> "she did not then reveal all of the abuse because, in her naivety, she didn't think that disclosing mere touching would result in the removal of [d]efendant from the house. She didn't want [Thomas] to grow up without a father. She was growing up without a mother and [Hillary] without a father, and she was sensitive to the problems [Thomas] would face if he lost his father."

As to why Katie continued to return to Woodbine Street for overnight stays and vacations with Sardinha and her family after the abuse began, the trial justice was compelled by Katie's explanation that "she already lost her own mother[,] * * *

[s]he didn't want to lose the rest of her maternal family."   The trial justice noted that Katie never recanted her allegations, despite the pushback she faced after her initial disclosure.

The trial justice also deemed Hillary a sincere and credible witness, particularly considering her ability to recall specific details concerning each incident of assault.  She was convinced by Hillary's testimony that she did not disclose the abuse because she feared defendant, noting that he was a "big guy" and she was just a young girl.  The trial justice found no issue with Hillary initially denying the abuse and was satisfied that Hillary did not want anyone to know because she was afraid that Thomas would be taken away from his family.

Contrary to the state's witnesses, the trial justice was not persuaded by defendant's testimony and found that he was not a credible witness on his own behalf.  In assessing his testimony, the trial justice concluded that "[h]e came across as cold, uncaring and arrogant."  She was especially critical of defendant's reaction to the allegations of child molestation, noting that "[h]e wasn't even angry" and willingly left the home, his son, and Sardinha without putting up a fight.

The trial justice also addressed defendant's argument that the complainants were motivated to fabricate the allegations and rejected those assertions.  She found that:

"It is interesting to note that there was not one iota of evidence to explain why [Katie] would have lied about those assaults. After she disclosed the abuse, she lost her relationship with her mother's family. They had no communication whatsoever. [Katie] felt terrible, but never recanted. It clearly was a great loss for her. She lost her grandmother, her aunt and her cousin. She clearly had cherished her relationship with [her grandmother, her aunt, and her cousin]. There was so much to lose, but nothing to gain unless it was true. And by disclosing she was able to end the abuse, at least the abuse of her."

The trial justice ultimately determined that she "would have issued the identical verdict provided by the jury" and found the evidence in favor of the jury verdict to be "overwhelming[.]"

We conclude that the trial justice carefully performed her duty as a thirteenth juror, assessing the material evidence in the record and independently weighing that evidence. She passed upon the credibility of the testimony by Hillary and Katie, finding both witnesses to be very credible—"a finding to which this Court accords great deference."[6] *State v. Moten*, 187 A.3d 1080, 1090 (R.I. 2018). We are disinclined to overturn the credibility findings of a trial justice, because "a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." *Rogers*, 207

---

[6] The trial justice also found Sardinha to be a credible witness, describing her as "sad rather than angry."

A.3d at 462 (quoting *Baptista*, 79 A.3d at 29-30). As such, we are satisfied that the trial justice committed no error in denying defendant's motion for a new trial.

## The Rule 404(b) Evidence

The defendant also argues that the trial justice erred in admitting evidence under Rule 404(b) of the Rhode Island Rules of Evidence without articulating the special relevance of the evidence in her limiting instructions.[7] He contends that the limiting instructions that the trial justice provided were insufficient.

In this case, the trial justice conducted a pretrial hearing on the state's motion to admit evidence pursuant to Rule 404(b). The state sought to admit evidence of uncharged acts of molestation, threats, and physical abuse by defendant against Hillary and Katie. The state expected both complainants to

---

[7] Rule 404(b) of the Rhode Island Rules of Evidence provides:

> "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable."

testify regarding an extensive amount of uncharged sexual conduct.[8]  The state further sought to introduce testimony that defendant threatened to hurt the complainants if they told anybody about the abuse, and testimony that defendant threw glass plates at Hillary, hit Hillary in the face and on the back, and squeezed her arms, leaving marks.  The state argued that this testimony was admissible under Rule 404(b) to show a common design, plan, intent, and defendant's lewd disposition, as well as demonstrating defendant's attitude toward sexual activity with the complainants.

The state agreed that the trial justice would give a limiting instruction both before the evidence was introduced and at the end of the case in order to reiterate to the jury that the evidence was admitted for a limited purpose.  The record

[8] At a pretrial hearing, the state specified the uncharged sexual conduct of defendant that it sought to admit.  Katie was expected to testify to fondling of her breasts, mouth-to-breast contact, mouth-to-vagina contact, penis-to-mouth contact, penis penetrating vagina, defendant masturbating while touching Katie's breasts, an incident where Katie performed fellatio on defendant while Hillary touched his genitals, various sexual acts performed on defendant while the other girl watched, three instances of Katie being forced to perform fellatio on defendant during the time she was in the fourth through sixth grades, over ten instances of cunnilingus, being molested "almost every night she spent" at the Woodbine Street apartment over the course of two years, and testimony that defendant would instruct the girls to touch each other while he masturbated.

Regarding Hillary's testimony, the state proffered that she would testify to kissing on the mouth, penile and oral penetration, mouth-to-breast contact, mouth-to-vagina contact, digital and vaginal penetration, being molested "[eighty] times over a two-year span[,]" forced fellatio in the presence of Katie, digital penetration in Katie's presence, two or three other instances of digital penetration alone with defendant, forced cunnilingus in the presence of Katie, and forced cunnilingus "switching between" Katie and Hillary.

reveals that defendant did not object to the introduction of this evidence. Defense counsel said he had no objection to evidence of the threats by defendant, and he withdrew his previous objection to the evidence of physical abuse. He noted that, although the evidence of molestation would be cumulative and would cause potential harm, his only concern was remedial, and he deferred to the trial justice to give an appropriate limiting instruction.

As promised, before the opening statements of counsel, the trial justice instructed the jurors about the limited purpose of uncharged conduct. Immediately after Katie testified that defendant would penetrate her "[a]lmost whenever [she] would go there[,]" the trial justice again instructed the jury regarding the limited purpose of evidence of uncharged acts. When the trial justice asked if defendant had any issue with that instruction, he responded, "No, Your Honor." Then, during Hillary's testimony, the trial justice gave another limiting instruction. Again, the trial justice asked if "everyone [was] satisfied[,]" and defendant responded, "Yes, Your Honor." Finally, in her final instruction to the jury, the trial justice included an instruction about uncharged acts.[9] When she finished charging the jury, she

---

[9] The trial justice instructed, in her final instructions to the jury,

called counsel to the sidebar and asked if they had exceptions to the jury charge; defense counsel replied, "None."

This Court has repeatedly held that the "'raise-or-waive' rule precludes our consideration of an issue that has not been raised and articulated at trial." *State v. Viveiros*, 45 A.3d 1232, 1243 (R.I. 2012) (quoting *State v. Bido*, 941 A.2d 822, 828 (R.I. 2008)). Thus, "if an objection to a jury instruction is not effectively raised below, it is waived on appeal." *State v. Crow*, 871 A.2d 930, 935 (R.I. 2005). Moreover, Rule 30 of the Superior Court Rules of Criminal Procedure provides, in pertinent part, that "[n]o party may assign as error any portion of the charge or omission therefrom unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection." It is crucial that an objection to a jury instruction be raised before the jury retires "because, once alerted to the perceived

---

"I want to talk to you about uncharged acts. I mentioned it to you a few times. You've heard evidence in this trial on other occasions the [d]efendant allegedly was involved in other alleged misconduct. Bear in mind that he hasn't been charged with any offense arising out of that alleged misconduct. That evidence was admitted for a limited purpose. It can't be considered as proof of bad character on his part or proof that he acted in conformity with the uncharged alleged acts when you consider the charges in this case.
"However, if you do wish to do so, you may consider evidence of uncharged alleged acts on the issue of opportunity, motive, plan, scheme, or lewd disposition toward either or both of the complaining witnesses."

error in the instruction that has been given, the trial justice has an opportunity to cure the alleged deficiencies before the jury retires for deliberations." *Crow*, 871 A.2d at 935; *see Viveiros*, 45 A.3d at 1244 ("By failing to raise a proper objection, defendant deprived the trial justice of any opportunity to remedy possible deficiencies in the instructions before they were delivered."); *State v. Hanes*, 783 A.2d 920, 924 (R.I. 2001) ("The purpose of the rule is to ensure that the trial justice is alerted to any deficiencies in the charge while there is still an opportunity for cure.").

In this case, the defendant did not object to the admission of the Rule 404(b) evidence, other than to request a limiting instruction—a request that the trial justice accommodated. Moreover, the defendant not only failed to object to the trial justice's numerous limiting instructions, he affirmatively deferred to her judgment and voiced his satisfaction with each limiting instruction as given. In doing so, the defendant acquiesced to the sufficiency of the trial justice's limiting instructions. The defendant afforded the trial justice no indication of the purported errors he now raises and, thus, no opportunity to remedy the alleged deficiency. We deem this a waiver. Because the defendant has failed to demonstrate that he is entitled to

any of the very narrow exceptions to the "raise-or-waive" rule, we hold that the objection to the instructions which he now seeks to argue is waived.[10]

## Conclusion

For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction. The papers in this case may be remanded to the Superior Court.

Justice Flaherty participated in the decision but retired before its publication.

Justices Lynch Prata and Long did not participate.

---

[10] In his brief to this Court, the defendant asks us to deviate from our adherence to the raise-or-waive rule and apply the narrow exception applicable to issues concerning basic constitutional rights. The defendant has not even approached the minimal requisite criteria for that exception.

## STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903



## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Jonathan Phillips. |
| **Case Number** | No. 2019-240-C.A. (P1/16-736A)  No. 2020-38-C.A. (P2/14-913A) |
| **Date Opinion Filed** | February 16, 2021 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Netti C. Vogel |
| **Attorney(s) on Appeal** | For State:  Virginia M. McGinn Department of Attorney General  For Defendant:  Kara Hoopis Manosh, Esq. |